## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

JOYCE CRUZ, individually and as natural parent and personal
representative for A.C.1, A.C.2, R.C., M.P. and A.S.; AJA
NICKENS, individually and as natural parent and personal
representative for A.N., J.I-N. JR, and A.I-N.; AUDREY PITTS-
FERGUSON, individually and as natural parent and personal
representative for S.L., D.L., and L.L.; LAWANTHA
WILLINGHAM, individually and as personal representative for
J.F.; LEISA THORNTON, individually and as natural parent and
personal representative for M.T.; LISA DAVIDSON, individually
and as natural parent and personal representative for W.S.;
RACHEL DIFFENDERFER, individually and as natural parent
and personal representative for M.D.; SARAH JO ODOM and
NAPOLEON ODOM JR., individually and as natural parents and
personal representatives for N.S., M.S. and N.O.III, Q.O., and
O.O.; SHATEIRA CHILDRESS, individually and as natural
parent and personal representative for D.N. AND S.N.;
KENDREA NEWMAN, individually and as natural parents and
personal representatives for Z.A.1, and Z.A.2; VERNELL
ARRINGTON; CANDY BELDIN and GREG BELDIN;
BRANDON BELDIN; SHERRI CROSS and GERALD CROSS;
JUANITA GIFFORD; STEVEN GRIFFITH; DANLISA
HAMILTON; EARNESTINE HENRY; ERIC HOLMAN;
SALLY HORTON; BONNIE HUBBELL; ANA MARIA
HUFTON; JAMES JONES; BRENDA MAYS and MARVIN
MAYS JR., individually and as natural parents and personal
representatives for A.M.1 and A.M.2 ; RAYMOND
MONTGOMERY; MICHEL MOORE; JOYCE MURDOCK;
LANITA MURRAY; THOMAS NORMAN; GERALD
PATILLA; JOSEPHINE PETTIGREW; MICHAEL REED;
JAMES RUDOLPH; SAMMY TAYLOR; FRED THOMAS;
DERRICK WEATHERSPOON, individually and as personal
representatives for ISIAH WEATHERSPOON; JOYCE
WHITESIDE,

> Plaintiffs,

LOCKWOOD, ANDREWS & NEWNAM, P.C.; LOCKWOOD,
ANDREWS & NEWNAM, INC.; LEO A. DALY COMPANY;
VEOLIA NORTH AMERICA, LLC; VEOLIA NORTH
AMERICA, INC.; VEOLIA WATER NORTH AMERICA
OPERATING SERVICES, LLC; GOVERNOR RICK SNYDER;
in his individual and official capacities, and the STATE OF
MICHIGAN for prospective relief only; DANIEL WYANT;
NICK LYON; ANDY DILLON; LIANE SHEKTER-SMITH;

Civil Action No.

## COMPLAINT

JURY TRIAL
DEMANDED

ADAM ROSENTHAL; STEPHEN BUSCH; PATRICK COOK;
MICHAEL PRYSBY; BRADLEY WURFEL all in their
individual capacities; CITY OF FLINT, a Michigan municipal
corporation; JEFF WRIGHT; EDWARD KURTZ; DARNELL
EARLEY; GERALD AMBROSE; DAYNE WALLING;
HOWARD CROFT; MICHAEL GLASGOW; and
DAUGHERTY JOHNSON in their individual and official
capacities, jointly and severally,

Defendants,

_____/

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, MONEY
DAMAGES, AND JURY DEMAND**

**INTRODUCTORY STATEMENT**

1.     This action is for personal injuries and property damages arising out Defendants'

unlawful conduct – which from April 25, 2014 to the present have experienced and will continue

to experience serious personal injury and property damage caused by Defendants' deliberate,

reckless, and negligent misconduct. Defendants caused a public health crisis by exposing

Plaintiffs to contaminated water. Defendants also exacerbated the crisis by concealing and

misrepresenting its scope, failing to take effective remedial action to eliminate it, and then

lying about it to cover up their misconduct.

2.     Two groups of Defendants are responsible for the severe harm suffered by the

Plaintiffs. A group of engineering companies, including Lockwood, Andrews & Newnam, P.C.

("LAN PC"), Lockwood, Andrews & Newnam, Inc. ("LAN Inc."), Leo A. Daly Company

("LAD"), Veolia North America, LLC ("Veolia LLC"), Veolia North America, Inc. ("Veolia

Inc."), and Veolia Water North America Operating Services, LLC ("Veolia Water") are

referred to collectively herein as the "Engineering Defendants." A group of government

officials and bodies, including Governor Rick Snyder, the State of Michigan, Daniel Wyant,

2

Nick Lyon, Andy Dillon, Liane Sheckter-Smith, Adam Rosenthal, Stephen Busch, Patrick Cook, Michael Prysby, Bradley Wurfel, City of Flint, Jeff Wright, Edward Kurtz, Darnell Earley, Gerald Ambrose, Dayne Walling, Howard Croft, Michael Glasgow, and Daugherty Johnson are collectively herein referred to as the "Government Defendants."

### Summary of the Engineering Defendants' Misconduct

3.     *Professional Negligence in Engineering Services Related to Distribution of Water From Flint River*: Plaintiffs have sustained serious injuries as a result of the Engineering Defendants' professional negligence in their duties relating to the distribution of water from the Flint River using the Flint Water Treatment Plant ("FWTP"), and in failing to report the dangers associated with not installing proper anti-corrosive treatment when using the Flint River as a primary source of water.

4.     *Professional Negligence and Fraud in Declaring Flint Water Safe and Potable*: Plaintiffs have sustained serious injuries as a result of the Engineering Defendants' professional negligence in failing to properly evaluate Flint's water system and in publicly declaring its water safe and potable. The Engineering Defendants failed to conduct a root cause analysis, which would have revealed that the pipes were corroding and causing lead and *legionella* to enter the resident's homes. The Engineering Defendants also failed to mention that the addition of a corrosion inhibitor was necessary to prevent these serious and well-known health issues, and mandated the usage of highly acidic ferric chloride, rather than advising that the pH of the water should be increased. The Engineering Defendants also were professionally negligent and committed fraud in their effort to cover up their mistakes by knowingly or recklessly misinforming the public about the existence and extent of the public health crisis.

### Summary of the Constitutional and Civil Rights Violations and Injuries Caused by the Governmental Defendants:

5. *Due process based on state created danger doctrine*: Plaintiffs have sustained violations of their substantive due process rights, including their fundamental right to not have the state create, inflict and/or exacerbate dangers through the culpable actions of public officials;

6. *Due process based on bodily integrity doctrine*: Plaintiffs have sustained violations of their substantive due process rights, including their fundamental right to not have their bodily integrity violated;

7. *Equal protection, race*: Plaintiffs have sustained serious injuries as a result of some of the Government Defendants' decision to deliver a superior water product to the water users in the remainder of Genesee County because that community was predominately white, while at the same time delivering a grossly inferior water product to water users in Flint because that community was predominately African American;

8. *Equal protection, wealth:* Plaintiffs have sustained serious injuries as a result of some of the Government Defendants' decision to protect the health of the water users in the remainder of Genesee County because that community was predominately more affluent and at the same time disregard the health of water users in Flint because that community was predominately poor.

9. *Violation of 42 U.S.C. § 1985(3):* Plaintiffs have sustained serious injuries as a result of the conspiracy of two or more of the Government Defendants to directly or indirectly conspire to violate Plaintiffs' constitutional rights, said conspiracy being based on invidious racial animus;

10. *Violation of Elliot Larsen Civil Rights Act ("ELCRA"):* Plaintiffs have sustained serious injuries as a result of their denial of the full and equal enjoyment of services provided by

some of the Defendants because they were residents of a predominately African American community; and

11.     Plaintiffs sustained personal injury, property damage, economic and emotional injury as a result of Defendants' conduct, as described herein.

## JURISDICTION AND VENUE

12.     This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking injunctive and declaratory relief together with monetary damages against the Government Defendants for violations of the Thirteenth and Fourteenth Amendments of the United States Constitution, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, *et seq.*

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which authorizes federal courts to decide cases concerning federal questions; 28 U.S.C. §1343(a)(3) and (4), which authorizes federal courts to hear civil rights cases; and 28 U.S.C. § 2201, the Declaratory Judgment Act and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

14.     The Court also has diversity jurisdiction under 28 U.S.C. § 1332(a). The matter in controversy in this suit exceeds $75,000, exclusive of interest and costs. At least one plaintiff is a citizen of the State of Michigan, and at least one defendant is a citizen of a different state – in particular, Defendant LAN, Inc. is a citizen of the State of Texas and Defendant Veolia is a citizen of the States of Delaware and Illinois.

15.     The Court has personal jurisdiction over the Engineering Defendants because each of them have personally availed themselves of the benefits and protections of the State of Michigan. Each of the Engineering Defendants conducted business and committed torts in Michigan, by themselves and their agents and/or alter egos, which caused plaintiffs to suffer severe personal and property injuries in Michigan. As such, the Court has personal jurisdiction over the Engineering Defendants pursuant to MCL 600.705 and MCL 600.715.

5

16.     The Court has personal jurisdiction over the Government Defendants named herein as public officials of the State of Michigan, including the Emergency Managers, sued in their individual capacities; and public officials and employees of the City of Flint, sued in their official and individual capacities; the Genesee County Drain Commissioner, sued in his official and individual capacity; and the City of Flint for its customs, policies or practices which affirmatively caused and/or contributed to the violations of Plaintiffs' Constitutional rights.

17.     Similarly, this Court has personal jurisdiction over the Governor of the State of Michigan, in his individual and official capacity, and the State of Michigan, both for prospective relief, exclusively.

18.     Venue is proper in this Court because the original injury and damage occurred in the Eastern District of Michigan, Defendants reside or conduct business in the Eastern District of Michigan, Plaintiffs reside in the Eastern District of Michigan and/or own property located in the Eastern District of Michigan that was damaged, and many of the occurrences described herein occurred in the Eastern District of Michigan.

19.     Plaintiffs provided Defendants, the Administrator of the U.S. Environmental Protection Agency (EPA), and the Michigan Attorney General with at least sixty days' written notice of the violations of law alleged here in the form and manner required by the Safe Drinking Water Act. 42 U.S.C. §300j-8(b); 40 C.F.R. §§ 135.11-.13. Written notice was provided on February 27, 2017.

## **PARTIES**

A.  **Plaintiffs**

20.     Plaintiffs have at all times relevant been residents of Flint, Michigan and citizens of the State of Michigan who have suffered personal injuries as a result of exposure to the City of Flint's drinking water, and/or property owners who have had property located in Flint damaged

from exposure to the City of Flint's drinking water, and/or have suffered or continue to suffer economic harm caused by the City of Flint's drinking water.

21.     As a result of the Engineering Defendants and the Governmental Defendants' actions, Plaintiffs have suffered personal injuries including, but not necessarily limited to brain and/or developmental injuries including (without limitation) lead poisoning, cognitive deficits, hair loss, skin rashes, digestive and other organ problems, physical pain and suffering, legionella, mental anguish, fright and shock, denial of social pleasures and enjoyments, embarrassment, humiliation and mortification.

22.     Plaintiffs have also suffered property damage in the form of corroded pipes, service lines, and appliances in the home, and economic loss in reduced property value and water bills for unsafe water.

23.     **Plaintiff Joyce Cruz** and her minor children **A.C., A.C.2, R.C., M.P. and A.S.** reside at 1706 Rose Lawn Drive, Flint, Michigan 48504. She owns her home, which is serviced by water provided by the City of Flint. Joyce Cruz and her minor children have tested positive for blood lead contamination in February 2017. Joyce Cruz and her minor children suffered damages as a direct and proximate result of Defendants' conduct described herein.

24.     **Plaintiff Aja Nickens** and her minor children **A.N., J.I-N. JR, and A.I-N**., reside at 2201 W Carpenter Rd Apt. 118B, Flint, Michigan 48505. She rents her apartment, which is serviced by water provided by the City of Flint. Aja Nickens and her minor children have tested positive for blood lead contamination in October 2014. Aja Nickens and her minor children suffered damages as a direct and proximate result of Defendants' conduct described herein.

25.     **Plaintiff Audrey Pitts-Ferguson** and her minor children **S.L., D.L.,** and **L.L.** reside at 2105 Stoney Brook Court, Flint, Michigan 48507. She owns her home, which is serviced

by water provided by the City of Flint. Audrey Pitts-Ferguson and her minor children have tested positive for blood lead contamination in March 2016. Audrey Pitts-Ferguson and her minor children suffered damages as a direct and proximate result of Defendants' conduct described herein.

26.     **Plaintiff Lawantha Willingham** and minor child **J.F.** reside at 4014 Comstock Ave, Flint, Michigan 48504, which is serviced by water provided by the City of Flint. Lawantha Willingham and J.F. have tested positive for blood lead contamination in February 2017. Lawantha Willingham and J.F. suffered damages as a direct and proximate result of Defendants' conduct described herein.

27.     **Plaintiff Lesia Thornton** and her minor child **M.T.** reside at 4617 Milton Drive, Flint, Michigan 48507, which is serviced by water provided by the City of Flint. Leisa Thornton and her minor child have tested positive for blood lead contamination in March 2016. Leisa Thornton and her minor child suffered damages as a direct and proximate result of Defendants' conduct described herein.

28.     **Plaintiff Lisa Davidson** and her minor child **W.S.** reside at 217 West Linsey Blvd, Flint, Michigan 48503. She rents her apartment, which is serviced by water provided by the City of Flint. Lisa Davidson and her minor child have tested positive for blood lead contamination in April 2016. Lisa Davidson and her minor child suffered damages as a direct and proximate result of Defendants' conduct described herein.

29.     **Plaintiff Rachel Diffenderfer** and her minor child **M.D.** reside at 3601 Sunset Drive, Flint, Michigan 48503, which is serviced by water provided by the City of Flint. Rachel Diffenderfer and her minor child have tested positive for blood lead contamination in January

2016. Rachel Diffenderfer and her minor child suffered damages as a direct and proximate result of Defendants' conduct described herein.

30.     **Plaintiff Sarah Jo Odom and Napoleon Odom Jr.** and their minor children **N.S., M.S. and N.O.III, Q.O., and O.O**. reside at 2113 W. Dayton Street, Flint, Michigan 48504, which is serviced by water provided by the City of Flint. Sarah Jo Odom, Napoleon Odom Jr., and their minor children have tested positive for blood lead contamination. Sarah Jo Odom, Napoleon Odom Jr., and their minor children suffered damages as a direct and proximate result of Defendants' conduct described herein.

31.     **Plaintiff Shateira Childress** and her minor children **D.N. and S.N.** reside at 1529 Berrywood Lane, Flint, Michigan 48507, which is serviced by water provided by the City of Flint. Shateira Childress and her minor children have tested positive for blood lead contamination in August 2016. Shateira Childress and her minor children suffered damages as a direct and proximate result of Defendants' conduct described herein.

32.     **Plaintiff Kendrea Newman** and her minor children **Z.A.1 and Z.A.2** reside at 5708 Edgar Holt Drive, Flint, Michigan 48505. She rents her apartment which is serviced by water provided by the City of Flint. Kendrea Newman and her minor children have tested positive for blood lead contamination. Kendrea Newman and her minor children suffered damages as a direct and proximate result of Defendants' conduct described herein.

33.     **Plaintiff Vernell Arrington** resides at 2944 Clements Street, Flint, Michigan 48504. He owns his home, which is serviced by water provided by the City of Flint. Vernell Arrington has suffered damages as a direct and proximate result of Defendants' conduct described herein.

34.     **Plaintiffs Greg Beldin and Candy Beldin** lived at 4206 Pengelly Road, Flint, Michigan 48507, at all times relevant herein. They owned their home which was serviced by water provided by the City of Flint. Greg Beldin and Candy Beldin suffered damages as a direct and proximate result of Defendants' conduct described herein.

35.     **Plaintiff Brandon Beldin Beldin** lived at 4206 Pengelly Road, Flint, Michigan 48507, at all times relevant herein. The property was serviced by water provided by the City of Flint. Brandon Beldin tested positive for blood lead contamination in August 2016. Brandon Beldin suffered damages as a direct and proximate result of Defendants' conduct described herein.

36.     **Plaintiffs Sherri Cross and Gerald Cross** reside at G–3426 Branch Road, Flint, Michigan 48506. They own their home which is serviced by water provided by the City of Flint. Sherri Cross and Gerald Cross have tested positive for blood lead contamination. Sherri Cross and Gerald Cross suffered damages as a direct and proximate result of Defendants' conduct described herein.

37.     **Plaintiff Juanita Gifford** resides at 5421 Nasser Street, Flint, Michigan 48505. She owns her home, which is serviced by water provided by the City of Flint. Juanita Gifford has suffered damages as a direct and proximate result of Defendants' conduct described herein.

38.     **Plaintiff Steven Griffith** resides at 2732 Tiptree Path, Flint, Michigan 48506. He owns his home, which is serviced by water provided by the City of Flint. Steven Griffith has suffered damages as a direct and proximate result of Defendants' conduct described herein.

39.     **Plaintiff Danlisa Hamilton** resides at 1813 Polly Street Nasser Street, Flint, Michigan 48505. She rents her apartment, which is serviced by water provided by the City of

Flint. Danlisa Hamilton has suffered damages as a direct and proximate result of Defendants' conduct described herein.

40.     **Plaintiff Earnestine Henry** resides at 702 Father Dukette Avenue, Apt 315 Flint, Michigan 48503. She rents her apartment, which is serviced by water provided by the City of Flint. Earnestine Henry has suffered damages as a direct and proximate result of Defendants' conduct described herein.

41.     **Plaintiff Eric Holman** resides at 902 E Court Street, Apt 405 Flint, Michigan 48503. He rents his apartment, which is serviced by water provided by the City of Flint. Eric Holman has suffered damages as a direct and proximate result of Defendants' conduct described herein.

42.     **Plaintiff Sally Horton** resides at 3804 Lawndale Ave, Flint, Michigan 48504. She rents her apartment, which is serviced by water provided by the City of Flint. Sally Horton has suffered damages as a direct and proximate result of Defendants' conduct described herein.

43.     **Plaintiff Bonnie Hubbell** resides at 3509 Comanche Ave, Flint, Michigan 48507, which is serviced by water provided by the City of Flint. Bonnie Hubbell has suffered damages as a direct and proximate result of Defendants' conduct described herein.

44.     **Plaintiff Ana Maria Hufton** resides at 1206 Blanchard Ave, Flint, Michigan 48503. She owns her home, which is serviced by water provided by the City of Flint. Ana Maria Hufton has suffered damages as a direct and proximate result of Defendants' conduct described herein.

45.     **Plaintiff James Jones** resides at 337 E Ridgeway Ave, Flint, Michigan 48505, which is serviced by water provided by the City of Flint. James Jones has suffered damages as a direct and proximate result of Defendants' conduct described herein.

46.     **Plaintiff Ana Maria Hufton** resides at 1206 Blanchard Ave, Flint, Michigan 48503. She owns her home, which is serviced by water provided by the City of Flint. Ana Maria Hufton has suffered damages as a direct and proximate result of Defendants' conduct described herein.

47.     **Plaintiffs Brenda Mays and Marvin Mays Jr.,** reside at 534 West Pulaski Street, Flint, Michigan 48505 with their minor children **A.M.1. and A.M.2**. They own their home, which is serviced by water provided by the City of Flint. The Mayses and her minor children have tested positive for blood lead contamination. They Mayses and her minor children suffered damages as a direct and proximate result of Defendants' conduct described herein.

48.     **Plaintiff Raymond Montgomery** resides at 3434 Brewster Ave, Flint, Michigan 48506. He owns his home, which is serviced by water provided by the City of Flint. Raymond Montgomery has tested positive for blood lead contamination in July 2016. Raymond Montgomery has suffered damages as a direct and proximate result of Defendants' conduct described herein.

49.     **Plaintiff Michel Moore resides** at 2438 Missouri Avenue, Flint, Michigan 48506. She owns her home, which is serviced by water provided by the City of Flint. Michel Moore has tested positive for blood lead contamination in March 2017. Michel Moore has suffered damages as a direct and proximate result of Defendants' conduct described herein.

50.     **Plaintiff Joyce Murdock** resides at 529 West Philadelphia Blvd, Flint, Michigan 48505. She owns her home, which is serviced by water provided by the City of Flint. Joyce Murdock has suffered damages as a direct and proximate result of Defendants' conduct described herein.

51.     **Plaintiff Lanita Murray** resides at 318 West Ruth Ave, Flint, Michigan 48505, which is serviced by water provided by the City of Flint. Lanita Murray has suffered damages as a direct and proximate result of Defendants' conduct described herein.

52.     **Plaintiff Thomas Norman** resides at 867 Victoria Ave, Flint, Michigan 48507. He owns his home, which is serviced by water provided by the City of Flint. Thomas Norman has tested positive for blood lead contamination in December 2016. Thomas Norman has suffered damages as a direct and proximate result of Defendants' conduct described herein.

53.     **Plaintiff Gerald Patilla** resides at 511 South Medade Street, Flint, Michigan 48503. He rents his apartment, which is serviced by water provided by the City of Flint. Gerald Patilla has suffered damages as a direct and proximate result of Defendants' conduct described herein.

54.     **Plaintiff Josephine Pettigrew** resides at 3010 Mackin Road, Flint, Michigan 48504. She owns her home, which is serviced by water provided by the City of Flint. Josephine Pettigrew has tested positive for blood lead contamination in March 2017. Josephine Pettigrew has suffered damages as a direct and proximate result of Defendants' conduct described herein.

55.     **Plaintiff Michael Reed** resides at 1908 Raskob Street, Flint, Michigan 48506. He rents his apartment, which is serviced by water provided by the City of Flint. Michael Reed has tested positive for blood lead contamination in February 2017. Michael Reed has suffered damages as a direct and proximate result of Defendants' conduct described herein.

56.     **Plaintiff James Rudolph** resides at 906 East Damon, Apt 2, Flint, Michigan 48505. He rents his apartment, which is serviced by water provided by the City of Flint. James Rudolph has suffered damages as a direct and proximate result of Defendants' conduct described herein.

57.     **Plaintiff Sammy Taylor** resides at 514 East Bishop Ave, Flint, Michigan 48505. He rents his apartment, which is serviced by water provided by the City of Flint. Sammy Taylor has suffered damages as a direct and proximate result of Defendants' conduct described herein.

58.     **Plaintiff Fred Thomas** resides at 6826 Orange Lane, Flint, Michigan 48505. He owns his home, which is serviced by water provided by the City of Flint. Fred Thomas has suffered damages as a direct and proximate result of Defendants' conduct described herein.

59.     **Plaintiff Derrick Weatherspoon** and his son **Isiah Weatherspoon** reside at 1224 Vermilya Ave, Flint, Michigan 48507. He rents his apartment, which is serviced by water provided by the City of Flint. Derrick Weatherspoon and Isiah Weatherspoon have suffered damages as a direct and proximate result of Defendants' conduct described herein.

60.     **Plaintiff Joyce Whiteside** resides at 1246 Flamingo Drive, Flint, Michigan 48458. She rents her apartment, which is serviced by water provided by the City of Flint. Joyce Whiteside has suffered damages as a direct and proximate result of Defendants' conduct described herein.

B.  **Engineering Defendants**

61.     Defendant LAN PC is a Michigan professional corporation with its principal place of business located at 1311 S. Linden Road, Suite B, Flint, Genesee County, Michigan 48532. In 2008, LAN PC was incorporated by LAN Inc., after it was retained to conduct studies and reports of a new water supply that was being developed for Flint, Genesee County. At this Flint location, LAN PC held itself out to the world as a LAD company. Upon information and belief, substantial amount of work and services provided by LAN P.C. were conducted at LAN Inc.'s Chicago, Illinois location.

62.     Defendant LAN Inc. is a Texas corporation with its principal place of business in Houston, Texas. At all relevant times, LAN Inc. conducted business in Genesee County,

Michigan through LAN PC. Per its website, LAN Inc.'s Michigan office is located at 1311 S. Linden Road, Suite B, Flint, Michigan 48532. LAN Inc. holds itself out as a full-service consulting firm offering planning, engineering and program management services, including civil infrastructure engineering and municipal water treatment and design. At all relevant times, LAN Inc. held itself out to be a LAD company.

63.     Defendant LAD is a Nebraska corporation with its principal place of business in Omaha, Nebraska. Per its website, LAD's "[s]ervices are extended through [LAN Inc.]." LAD's website advertises that it has "experience, creativity and technical experience . . . in every service we offer[,]" which includes "[p]lanning, architecture, engineering and interior design, and program management [] delivered by multidisciplinary teams hand-picked to provide the precise combination of expertise required for project success." Additionally, LAD's website indicates: "[a]s a multi-disciplinary firm, engineering is an integral part of our process from the beginning of each project. Our engineers work closely with planners, architects and interior designers . . . . Our in-house engineers also provide services for engineering projects independent of architectural design services."

64.     The corporate structure of LAD and LAN Inc. is such that LAD exerts nearly unfettered control over its subsidiary. The top executives between Defendants are identical – Leo A. Daly, III serves as Chairman and CEO of both LAD and LAN Inc., and Dennis W. Petersen is the President of both. Three of LAN Inc.'s seven directors are high ranking LAD executives, including Mr. Daly, Mr. Petersen and James B. Brader, the CFO of LAD. While LAN Inc. does not appear to retain a CFO, LAD's CFO is one of LAN Inc.'s seven board members. On information and belief, Mr. Brader serves as the *de facto* CFO of LAN Inc. and controls LAN Inc.'s finances. LAD and LAN Inc. share offices in Houston (LAN's principal place of business),

Los Angeles and Miami. For example, the relationship between these entities is exemplified by the footer on the bottom of the "Final Operational Report, Trihalomethane Formation Concern," which lists the author as "LAN, Lockwood, Andrews & Newnam, Inc. A Leo A Daly Company." Both this document and the LAN Inc. website, http://www.lan-inc.com/, include the logo:



65.     Defendants LAN PC, LAN Inc. and LAD (collectively "LAN" or "LAN Defendants") are defendants in this action based on their collective failure to properly place the Flint Water Plant into operation using the Flint River as a primary source, specifically neglecting to ensure the viability of the water source for use by the public, and failing to insist upon and implement the necessary safeguards through the plant to allow the water to be safely consumed by the public, and failure to report the dangers associated with not installing proper anti-corrosive treatment when using the Flint River as a primary source of drinking water. The LAN Defendants worked in concert in negligently advising the government and thereby causing the damage alleged herein. In addition to the alter ego allegations above, the entities are referred to collectively because they acted in concert and their acts overlapped or were identical.

66.     Defendant Veolia LLC is a Delaware Limited Liability Company with its principal place of business at 200 E. Randolph Drive, Suite 7900, Chicago, Illinois 60601.

67.     Defendant Veolia Inc. is a Delaware Limited Liability Company with its principal place of business at 200 E. Randolph Drive, Suite 7900, Chicago, Illinois 60601.

68.     Defendant Veolia Water is a Delaware Limited Liability Company with its principal place of business at 101 W. Washington Street, Suite 1400 East, Indianapolis, Indiana 46204.

69.     Veolia LLC, Veolia Inc. and Veolia Water design and provide water solutions for communities and industries across North America under the banner "Veolia North America."

70.     Non-party Veolia Environment, S.A. is a French transnational corporation with its principal place of business at 36-38 Avenue Kleber, 75116, Paris, France. Veolia S.A. provides its services through, and thus derives its revenues from, its four global divisions — water management, waste management, public transport and energy services. The divisions provide its services across the globe, and in North America, those services are provided under the aforementioned moniker "Veolia North America."

71.     In or around 2005, Veolia Environment, S.A. united these four global divisions under a single umbrella, and since then, has held out itself and all other Veolia entities to the world simply as one "Veolia." Indeed, Veolia Environment, S.A. adopted this simple "Veolia" branding across all of its businesses, which is evidenced on its website and press releases.

72.     The four global divisions are composed of the subsidiaries and other businesses owned and otherwise controlled by Veolia Environment, S.A.

73.     Veolia Environment, S.A. ("Veolia S.A.) and its divisions also underwent a restructuring beginning around 2011. As described by Veolia S.A. Chair and CEO Antoine Frerot, "[o]ur new organization is based on some simple principles—operating as an integrated company, establishing a single Veolia in each country, setting up regional management teams and strengthening corporate management functions." Veolia 2013 Annual and Sustainability Report at 10 (available at http://www.veolia.com/en/2013-activity-and-sustainability-report). In other words, "[t]he new Veolia is one Veolia." *Id.* at 14.

74.     As a result, the corporate structure of Veolia S.A., Veolia LLC, Veolia Inc. and Veolia Water (the latter three collectively, "Veolia" or "Veolia Defendants") is such that Veolia

S.A. exerts nearly unfettered control over the entire Veolia empire. The Veolia Defendants hold themselves out to the world as a single entity, examples of which are numerous and readily observed in the public domain. For example, the Veolia website makes no effort to distinguish or advertise any distinct legal entities, instead grouping them together and collectively presenting themselves to the world as "Veolia." When "Veolia" advertises the number of its employees and reports its annual revenue, it does so collectively. And Veolia markets itself as "Veolia, which is the world's largest water services and technology company."

75. In Flint Michigan, specifically, February 10, 2015 joint press release stated:

> The City of Flint has retained a team of urban water experts from Veolia North America to conduct an analysis of the city's water system. Veolia, which is the world's largest water services and technology company, will assess how Flint's water is tested and distributed, including reviewing water treatment processes and operations, laboratory testing and analysis, and engineering reports that detail the city's treatment and distribution systems.

(available at https://www.cityofflint.com/2015/02/10/flint-hires-international-urban-water-experts-of-veolia-north-america-to-assess-citys-water-issues/). And, in a February 2015 Veolia Water Quality Report, which forms part of the basis of Plaintiffs' claims and has caused plaintiffs severe injuries, the Veolia Defendants refer to themselves simply as "Veolia."

76. Upon information and belief, the Veolia Defendants are controlled by the same top executives, and revenues are commingled and reported as one. As such, the Veolia Defendants disregard corporate formalities and do not adequately or separately capitalize each of their respective businesses.

77. The Veolia Defendants have abused the corporate form to avoid liability in this matter. Indeed, while it appears Veolia Water may have executed the subject contract with the City of Flint, the Veolia Defendants, together, as indistinguishable entities, performed services

18

and presented their conclusions as "Veolia." At all times relevant, the Veolia Defendants have represented to the world that they are not distinct legal entities but rather one and the same.

78.     The Veolia Defendants collectively maintain several offices in Michigan, including Westland, Livonia and Grand Rapids, where they regularly conduct business.

79.     The Veolia Defendants are parties to this action based upon providing professionally negligent engineering services in reviewing Flint's water system and declaring the water safe to drink. The Veolia Defendants worked in concert in negligently advising the government and thereby causing the damage alleged herein. In addition to the alter ego allegations herein, the entities are referred to collectively because they acted in concert and their acts overlapped or were identical.

80.     Additionally, both the Veolia and LAN Defendants are parties to this action because, among other reasons, they were professionally negligent in several ways: These defendants (1) failed to conduct a root cause analysis which would have revealed that the pipes were corroding and causing lead and *legionella* to enter the residents' homes; (2) failed to recognize at least several red flags that should alert a prudent engineer to extensive corrosion problems and lead to implementation of effective protective measures; (3) failed to advise the City that they were out of compliance with the Safe Drinking Water Act's Lead and Copper Rule; (4) failed to advise the City that the addition of a corrosion inhibitor was necessary to prevent lead poisoning and Legionnaires' disease; and (5) advised the City to use or even increase the dosage of highly acidic ferric chloride, rather than advising that the pH of the water should be increased.

C. **Government Defendants**

81.     All individual Defendants are sued in their individual and/or official capacities as indicated below.

82.     Defendant Rick Snyder is the Governor of the State of Michigan ("Governor") and is vested with executive power pursuant to Art. V, Section 1 of the Michigan Constitution. The Governor is responsible for the management of state government for the health and welfare of its citizens and residents and is sued by Plaintiffs in both his individual capacity for compensation for the Plaintiffs, insofar as his deliberate conduct constituted an abuse and/or misuse of his authority, and, in his official capacity, for prospective equitable relief to correct the harm caused and prolonged by state government and to prevent future injury. The Governor is sued in his individual capacity for the injuries he caused to Plaintiffs resulting from his deliberately indifferent deprivation of Plaintiffs' constitutional and civil rights.

83.     Defendant State of Michigan ("the State") operates its Department of Environmental Quality ("MDEQ"), which is the state department primarily responsible for the environmental safety and health of Michigan citizens and residents. The State is sued for injunctive and/or prospective relief, because, acting through MDEQ and its employees, it caused the public health crisis at issue in this case, concealed the harm that it caused and has exacerbated and prolonged the injuries to Plaintiffs by failing to effectively remediate the harm it caused and concealed.

84.     Daniel Wyant ("Wyant") was Director of MDEQ and is sued by Plaintiffs in his individual capacity because he participated in the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm.

85.     Andy Dillon ("Dillon) was Treasurer for the State of Michigan and is sued by Plaintiffs in his individual capacity because along with the Governor, Jeff Wright, Dayne Walling and Edward Kurtz, caused harm to Plaintiffs when they developed an interim water delivery plan

in June 2013 which favored the predominately white Genesee County water users and discriminated against the water users in Flint, a predominantly African American community.

86.     Nick Lyon ("Lyon") was Director of the Michigan Department of Health and Human Services ("MDHSS") and is sued by Plaintiffs in his individual capacity because he participated in the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

87.     Liane Shekter-Smith ("Smith") was Chief of the Office of Drinking Water and Municipal Assistance for MDEQ, holding that position until October 19, 2015 when she was removed from her position. Smith is sued in her individual capacity because during her term as Chief of Drinking Water for MDEQ, she approved and participated in the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm her department caused Plaintiffs.

88.     Adam Rosenthal ("Rosenthal") was a Water Quality Analyst assigned to the Lansing District Office of the MDEQ. Rosenthal is sued in his individual capacity because, as Water Quality Analyst for MDEQ, he approved and participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

89.     Stephen Busch ("Busch") was District Supervisor assigned to the Lansing District Office of the MDEQ. Busch is sued in his individual capacity because, as District Office Supervisor of MDEQ, he deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

90.     Patrick Cook ("Cook") was at all relevant times a Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of the MDEQ. Cook is sued in his individual capacity because, as Water Treatment Specialist District of MDEQ, he approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

91.     Michael Prysby ("Prysby") was an Engineer assigned to District 11 (Genesee County) of the MDEQ. Prysby is sued in his individual capacity because, as Engineer assigned to District 11, he approved of, and thereby participated in the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of harm his department caused Plaintiffs.

92.     Bradley Wurfel ("Wurfel) was the Director of Communications for MDEQ. Wurfel is sued in his individual capacity because, as Director of Communications for MDEQ, he was responsible for the deliberately misleading and inaccurate communications that increased and prolonged the public health crisis at issue in this case and for making false statements and providing false assurances which caused harm to Plaintiffs.

93.     Defendant City of Flint ("Flint" or "the City") is a Michigan municipal corporation located in Genesee County, Michigan. Through its Department of Public Works, Flint distributes water to nearly 100,000 residents. When Flint Emergency Manager Darnell Earley, as the City's final policymaking authority, made the decision, on behalf of the State of Michigan and the City, to rush the distribution of water from the Flint River without proper treatment, including corrosion control, Plaintiffs were poisoned. It was the official custom, policy, and/or practice of the City, for

which it is directly responsible, that led to the violations of Plaintiffs' constitutional rights described herein.

94.     Jeff Wright ("Wright") has been the Genesee County Drain Commissioner since 2001. Wright is sued in his individual capacity because, as the Genesee Country Drain Commissioner, he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment of the United States Constitution.

95.     Edward Kurtz ("Kurtz") was the Emergency Manager of Flint appointed by the Governor in August 2012 and served in this capacity until July 2013. Kurtz is sued in his individual capacity because, during his term as Emergency Manager of Flint, he deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs. Kurtz is also sued because he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in or aided and/or abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment of the United States Constitution.

96.     Darnell Earley ("Earley") was the Emergency Manager of the City of Flint appointed by the Governor on November 1, 2013 and served in this capacity until January 12, 2015. Earley is sued in his individual capacity because, during his term as Emergency Manager of Flint, he deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs. Earley is also sued because

23

he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment of the United States Constitution.

97. Gerald Ambrose ("Ambrose") was the Emergency Manager of the City of Flint appointed by the Governor on January 13, 2015 and served in this capacity until April 28, 2015. Ambrose is sued in his individual capacity because, during his term as Emergency Manager of Flint, he deliberately increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs. Ambrose is also sued because he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment of the United States Constitution.

98. Dayne Walling ("Walling") was Mayor of Flint from August 4, 2009 until November 9, 2015 when he was unseated by Karen Weaver. Walling is sued in both his individual and official capacities. He is individually liable insofar as he personally approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs. Walling is also sued because he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment of the United States Constitution. Additionally, as Mayor, he was a policymaker for the City of Flint within the

24

meaning of *Monell*, and as such his actions constituted customs, policies and/or practices of the City of Flint.

99.    Howard Croft ("Croft") was Director of Public Works for the City of Flint. Croft is sued in his individual capacity because, as Director of Public Works, he approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs.

100.    Michael Glasgow ("Glasgow") was Utilities Administrator for the City of Flint. Glasgow is sued in his individual capacity because as Utilities Administrator, he deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs.

101.    Daugherty Johnson ("Johnson") was the Utilities Administrator for the City of Flint. Johnson is sued in his individual capacity because, as Utilities Administrator, he approved of, and thereby participated in the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs.

102.    Defendants Kurtz, Earley and Ambrose as Emergency Managers, acted in both their individual capacities and as agents of the State of Michigan, and their official capacities as policy makers for City of Flint within the meaning of *Monell*, and as such their actions constituted customs, policies and/or practices of City of Flint.

103.    At all relevant times hereto, the conduct of Defendants Walling, Croft, Glasgow and Johnson was pursuant to the customs, policies and/or practices of City of Flint.

**STATEMENT OF FACTS**

104.    This case arises from the tragic and preventable poisoning of the City of Flint. The outrageous acts and omissions of the Defendants have caused immeasurable and irreparable harm to Plaintiffs.

**A.  Dangers From the Flint River Water Have Been Well-Known for Decades**

105.    The FWTP was constructed in 1917 to draw water from the Flint River as the source of Flint's drinking water for nearly 50 years until 1964.

106.    As early as 1964, the U.S. Geological Survey noted high levels of chloride in the Flint River. Due to the concerns regarding the adequacy of the Flint River to provide safe drinking water, Flint evaluated alternatives for a new water supply, and ultimately switched providers. From 1964 to 2014, Flint water users received their water from Lake Huron via purchase from the Detroit Water and Sewerage Department ("DWSD"). This water did not require treatment through the FWTP.

107.    During this half-century, Flint water users enjoyed safe, clean, fresh water in their homes, businesses, hospitals and other places of public services.

108.    However, since approximately the 1990s, Flint and other local governmental entities had growing concerns over the cost of the DWSD water supply. Amidst these growing concerns, Flint and the other local governmental entities commissioned studies for alternative water supplies:

    a.    A 2001 report by the Department of Natural Resources noted that certain businesses along the Flint River had permits to discharge runoff from industrial and mining activities as well as petroleum and gasoline cleanups.

    b.    In 2004, a technical assessment of the Flint River raised concerns about using the river as a source of drinking water. One of the key points from the technical assessment, entitled "Source Water Assessment Report for the City of Flint Water Supply – Flint River Emergency Intake," prepared by the U.S. Geological Survey,

the MDEQ, and the Flint Water Utilities Department, was that the Flint River was a highly sensitive drinking water source that was susceptible to contamination.

c.      In 2006 and 2009, Flint and the local governmental entities completed additional studies for alternative water supplies. The 2009 study, prepared by the LAN Defendants and others, evaluated two alternatives for water supply – continue to purchase from DWSD, or construct a new pipeline (later known as the Karegnondi Water Authority ("KWA") pipeline) from Lake Huron.

d.      In 2011, Flint officials commissioned a study to determine if the Flint River could be safely used by the city as the primary source of drinking water. The "Analysis of the Flint River as a Permanent Supply for the City of Flint, July 2011" ("2011 Report"), prepared by Rowe Engineering and the LAN Defendants, cautioned against the use of the Flint River water and the dormant FWTP. The report concluded that "water from the river can be treated to meet current regulations; however, additional treatment will be required than for Lake Huron Water . . . . Although water from the river can be treated to meet regulatory requirements, aesthetics of the finished water will be different than that from Lake Huron." The study further concluded that such treatments to Flint River water could be done if improvements were made to the FWTP. However, if used as a water supply, the study noted that "a source water protection management plan should be developed to . . . identify potential sources of contamination . . . ."

e.      The LAN Defendants also prepared an additional analysis, attached to the 2011 Report as an appendix, which detailed over $69 million in improvements that would have to be made to bring the FWTP up to current standards. This additional analysis specifically projected costs for corrosion control chemicals that would be required to ensure the safety of water to be drawn from the Flint River.

109.    Use of the Flint River as a primary drinking source was rejected in 2011.

## B. Despite These Well-Known Dangers, Defendants Decided to Use Flint River Water as the Primary Water Source for the City of Flint

110.    In August 2012, the Governor appointed Edward Kurtz as Flint's Emergency Manager.

111.    In November of 2012, Kurtz wrote to State of Michigan Treasurer Andy Dillon suggesting that Flint join the yet to be formed KWA due to projected cost savings over DWSD. This was pursuant to the Emergency Manager's mandate to cut costs, and consistent with political

pressure from Genesee County Drain Commissioner Jeffrey Wright, who had encouraged the formation of the KWA in 2009.

112.   Throughout 2012, DWSD presented to Kurtz, Wright, Dillon, Walling and the Governor compelling arguments, based on numerous studies, demonstrating that from a cost and water reliability standpoint, Flint should reject Wright's pressure to join KWA and continue to receive water from DWSD. Most of the discourse about Flint joining KWA or continuing with DWSD, included Wright who consistently raised arguments designed to persuade Kurtz, Dillon and the Governor that the DWSD cost studies were wrong.

113.   In late 2012, Dillon, reacting to Wright's contention that the DWSD cost studies were wrong, requested the independent engineering firm of Tucker, Young, Jackson and Tull ("TYJT") to assess whether it would be cost-effective for Flint to switch from water supplied by DWSD and join the KWA water delivery system. In February 2013, TYJT concluded that it would be more cost-effective for Flint on both a short term and long term basis to continue to be supplied with water from DWSD.

114.   On March 27, 2013, MDEQ officials, sensing that Kurtz, Wright, Walling and Dillon were pushing the Governor to approve Flint joining the KWA, acknowledged that the decision to switch the water source for Flint was not based on a scientific assessment of the suitability of the Flint River water. In their own words, "As you might guess we are in a situation with Emergency Financial Managers so it's entirely possible that they will be making decisions relative to cost."

115.   On March 28, 2013, in an email from Dillon to Governor Rick Snyder, with copies to numerous other Treasury officials and Wyant, Dillon recommended that he authorize KWA going forward, even though the independent firm he hired to perform a cost evaluation

said staying with DWSD made the most economic sense. Dillon wrote the Governor, explaining that, "based upon today's presentations to the DEQ by the City of Flint, KWA and the engineering firm (Tucker Young) Treasury hired to vet the options as to whether Flint should stay with DWSD or join KWA, I am recommending we support the City of Flint's decision to join KWA. The City's Emergency Manager, Mayor, and City Council all support this decision. Dan Wyant likewise concurs and will confirm via email." Dennis Muchmore, Governor Snyder's Chief of Staff, confirmed in a subsequent email that it was Dillon who made "the ultimate decision" to switch Flint water from the DWSD to the KWA.

116.    On April 16, 2013, Governor Snyder, in what is now understood to be a non-fiscal decision, authorized Kurtz to enter into a contractual relationship with KWA for the purpose of supplying water to Flint beginning in mid-year 2016.

117.    Governor Snyder participated in discussions between his appointed Emergency Manager of Flint, Mr. Kurtz, and his appointed Emergency Manager of Detroit, Kevin Orr. At the time the Governor authorized Kurtz to contractually bind Flint to the KWA project, the Governor and State officials knew that the Flint River would be used as an interim source.

118.    In June 2013, Dillon, Kurtz, Wright, and Walling developed an interim plan ("Interim Plan") to use the Flint River water before KWA became operational. The Interim Plan would cover 2.5 years (April 25, 2014 until approximately October, 2016).

119.    Dillon, Kurtz, Wright and Walling knew that in 2011 the Flint River was professionally evaluated and rejected as a drinking source and that upgrades for the FWTP would cost millions.

120.    The Governor, in a timeline prepared by his office, confirmed that in June 2013, he knew that Flint River water would be used as an interim source of water.

121.   In May 2013, Emergency Manager Kurtz announced his resignation effective July 2013. The Governor reappointed Michael Brown as Flint's Emergency Manager.

122.   In September 2013, after Emergency Manager Brown resigned, Darnell Earley was appointed by the Governor as Flint's Emergency Manager.

123.   Michael Glasgow, the City of Flint's water treatment plant's laboratory and water quality supervisor informed the MDEQ on April 16, 2014, that the FWTP was not fit to begin operations and that "management" was not listening to him because "they seem to have their own agenda." Glasgow continued, "Glasgow said on April 16, 2014 that ".... it looks as if we will be starting the plant up tomorrow and are being pushed to start distributing water as soon as possible . . . . I would like to make sure we are monitoring, reporting and meeting requirements before I give the OK to start distributing water." The next day, Glasgow wrote Prysby and Busch of the MDEQ, that "….. I have people above me making plans to distribute water ASAP. I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction. I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready. I will reiterate this to management above me, but they seem to have their own agenda."

124.   Beginning in June 2013 and continuing through April 25, 2014, the State created a dangerous public health crisis for the users of Flint tap water when it and Kurtz and Earley ordered and set in motion the use of highly corrosive and toxic Flint River water knowing that the FWTP was not ready.

125.   For at least a year prior thereto, the State knew that using the Flint River water was dangerous and could cause serious public health issues.

30

**C. The LAN Defendants Failed to Meet Their Duties of Care and Competence as Design Engineers for the Flint Water Treatment Plant**

126.    On June 10, 2013, the LAN Defendants submitted a proposal to Flint for upgrading the FWTP entitled "Flint Water Treatment Plant Rehabilitation – Phase II." The proposal was to make "improvements . . . intended to help the City operate[] the plant on a full time basis using the Flint River." The proposal was signed by J. Warren Green, Professional Engineer (Project Director) and Samir F. Matta, Professional Engineer (Senior Project Manager).

127.    The LAN Defendants claimed in their proposal that their "staff has the knowledge, expertise and the technical professionals to handle all aspects of the projects. Our staff has firsthand knowledge of the [FWTP] . . . ."

128.    The proposal included the following relevant sections:

      a.      A "Scope of Services" section that stated the "project involves the evaluation and upgrade of the Flint Water Plant to provide continuous water supply service to the City of Flint (Flint) and its customers." The upgrades and improvements would allow the use of the Flint River as a water supply.

      b.      A "Standards of Performance" section where the LAN Defendants "agree[d] to exercise independent judgment and to perform its duties under this contract in accordance with sound professional practices." As part of the proposal, it was understood that Flint was relying upon the professional reputation, experience, certification, and ability of the LAN Defendants.

129.    In or around June 2013, Flint formally retained the LAN Defendants as the design engineer for improvements and upgrades to the FWTP for the treatment of new water sources, including both the Flint River and the KWA pipeline. In deciding to proceed with the transition to the Flint River, the City of Flint noted the LAN Defendants' "extensive experience in this field," and relied upon the LAN Defendants' identification of the "engineering, procurement, and construction needs" for the project. Although the City recognized that water from the Flint River

31

"would be more difficult to treat," the City concluded, based on LAN's recommendations, that the Flint River was "viable as a source" of the City's water. LAN continued to advise the City with respect to its transition to the Flint River through 2015, and ultimately was paid more than $3.8 million for its engineering services.

130.    Upon information and belief, there were no bids submitted by the LAN Defendants or any other firm for this work, nor were any other firms considered for this work. The contract was awarded without competitive bidding.

131.    On June 29, 2013, LAN met with representatives of Flint, representatives of the Genesee County Drain Commissioners Office and the MDEQ to discuss:

    a.    Using the Flint River as a water source;

    b.    The ability to perform the necessary upgrades to the FWTP;

    c.    The ability to perform quality control;

    d.    The ability for Flint to provide water to Genesee County;

    e.    The ability to meet an April or May 2014 timeline; and

    f.    Developing a cost analysis.

132.    According to incomplete meeting minutes, "the conversation was guided with focus on engineering, regulatory, and quality aspects . . ." of the items previously referenced, and the following determinations were made:

    a.    The Flint River would be more difficult to treat, but was viable as a source;

    b.    It was possible to engineer and construct the upgrades needed for the treatment process;

    c.    It was possible to perform quality control "with support from LAN engineering which works with several water systems around the state, quality control could be addressed[;]"

> d.   FWTP did not have the capacity to treat and distribute sufficient water to meet the needs of Flint and Genesee County;
>
> e.   There were many obstacles to overcome, but completion by the April or May 2014 timeline was reachable; and
>
> f.   The next steps were for the LAN Defendants to present Flint with a proposal that would include engineering, procurement, and construction needs for the project along with cost estimates.

133.   Since 1965, the FWTP served as a secondary and backup water supply system to the DWSD. Typically, a secondary supply for a public water system would be needed only during emergency situations, and is normally designed for short-term operation such as providing the average daily demand for only a few days.

134.   Upon information and belief, the FWTP was previously upgraded in or around 2004 in order to allow it to operate for an extended short-term period (i.e., approximately 6 weeks) because of a perceived high risk that the DWSD supply would fail and remain out of service for an extended duration.

135.   Due to the aforementioned 2013 agreement, the FWTP needed upgrading to operate on a full-time basis, otherwise it would be unable to provide the citizens of Flint with sufficient quantities of water.

136.   In April of 2014, the LAN Defendants, Flint and MDEQ officials addressed and discussed optimization for lead, and they decided that having more data was advisable before implementing an optimization method.

137.   On April 9, 2014, the City received the necessary permits from MDEQ to draw Flint River water for distribution as the supply source for its water distribution system during the multi-year transition to the new KWA facility.

138.    Despite receiving these permits, the Flint water system was not prepared for the switch to Flint River water. The Flint River was contaminated with rock-salt chlorides washed into the river from road surfaces over the course of many harsh Michigan winters. The level of chlorides in the Flint River was eight times the levels provided in DWSD water. Chlorides are highly corrosive, and must be neutralized with anticorrosive agents, such as phosphates, before entering public water systems. It is well known that corrosive water that is not properly treated results in the corrosion of pipes, such that the metals in the pipes, including lead, will leach into drinking water.

139.    The LAN Defendants knew, if not recommended, that the FWTP would begin drawing water from the Flint River later that month that would not be treated with anti-corrosive measures. Moreover, the potential consequences in endangering the public health as a result of not using anti-corrosive treatments when using water from the Flint River as the primary source were or should have been well-known and foreseeable to the LAN Defendants, engineering firms that, according to their website, were a "national leader in the heavy civil infrastructure engineering industry," "one of the most respected engineering firms in the United States today," and "a recognized leader in the industry with a rich history of serving a diverse group of heavy civil infrastructure clients across the country."

140.    From July of 2013 through April of 2014, the LAN Defendants provided professional engineering services associated with the switch from the DWSD to the FWTP, but failed to meet their duty of care and competence. The LAN Defendants were responsible for providing engineering services to ensure that the FWTP was equipped to treat water from each of its new sources. The LAN Defendants' actions facilitated the transfer of Flint's water source to river water without proper corrosion control treatment. The improvement and upgrade plans to the

34

FWTP were approved by MDEQ in April of 2014 pursuant to plans and specifications signed and sealed by the LAN Defendants. Further, the LAN Defendants, as Flint's outside contractor, had a duty to recognize the need for corrosion control and advise that it should be implemented. Yet, incredibly, at the time of the switch to Flint River water, no phosphates were being added to the water supply. In fact, nothing whatsoever was being done to account for the corrosive nature of the Flint River water. Moreover, the LAN Defendants did not require water quality standards to be set for the Flint River water that would be delivered to Flint's residents and property.

### D. Numerous Signs of the Public Health Crisis Caused By the Contaminated Water Were Evident Within Weeks of the Switch

141.    On April 25, 2014, Flint officially began using the Flint River as its primary water source, despite the fact that the proper preparations had not been made and Glasgow had warned that the FWTP was not ready.

142.    Within weeks of switching water sources, complaints began to pour in from residents regarding the smell, taste, and color of the drinking water.

143.    In June 2014, citizen complaints about contaminated water continued without the State doing anything to address these complaints. Many Flint water users reported that the water was making them ill.

144.    On August 14, 2014, Flint's water tested above legal limits for total coliform and E. coli bacteria. The City issued boil water advisories on August 16, 2014 and September 5, 2014 in response.

145.    To address the bacteria problem, the water was treated with additional chlorine. However, as has been well known for decades, in corroded pipes, chlorine preferentially reacts with the bare metal instead of attacking solely bacteria. The addition of substantial amounts of chlorine to a water supply was thus ineffective in treating bacteria – so more chlorine was added.

146.    The use of chlorine to disinfect water produced various disinfection byproducts, including trihalomethanes (often referred to as "Total Trihalomethanes" or "TTHM"). When bare pipes are not protected with a corrosion control protocol, more chlorine yields more TTHM.

147.    Immediately after the discovery of Flint's bacterial problems, it was apparent that Flint's TTHM levels were high. This should have been a red flag that the steel in the pipes had been laid bare by the high salt concentrations the water pumped from the Flint River.

148.    As officials were beginning to assess the extent of Flint's TTHM problems, another problem emerged in the summer of 2014 – the Michigan Department of Health and Human Services (MDHHS) reported an outbreak of Legionnaires' disease – another red flag.

149.    Legionnaires' disease is a severe form of pneumonia which, when treated early enough, has a mortality rate of 20%; if left untreated, the rate rises to 80%. Infection in humans occurs when water droplets contaminated with *legionella* bacteria are inhaled or when water-containing *legionella* enters the trachea. Extensive studies of *legionella* have established that the pathogen enters the water supply when the "bio-film" protecting pipes is stripped away – which is exactly what happened when the River's corrosive water entered the City's pipes.

150.    In addition to a rise in the reported incidence of Legionnaires' disease, MDHHS first noted another potential problem related to Flint's water in September 2014 – lead poisoning rates "were higher than usual for children under age 16 living in the City of Flint during the months of July, August and September, 2014."

151.    As early as October 1, 2014, it was known that one of the causes of the bacterial contamination was the existence of iron pipes in the City's water distribution system.

152.    Most of Flint's 550 miles of water mains are now over 75 years old and constructed of cast iron piping. Cast iron pipe is subject to internal corrosion, called tuberculation,

which causes buildup on the pipe interior, leading to water quality issues, reduced flow and pressures, and leakage. Tuberculation also encourages the development of biofilms, layers of bacteria that attach to the interior pipe wall.

153.    On October 13, 2014, General Motors ceased the use of Flint River water at its engine plant because of fears that it would cause corrosion due to high levels of chloride.

154.    On December 31, 2014, the first round of lead monitoring showed results exceeding the Lead and Copper Rule's action levels for lead, 15 parts per billion. Worse yet, these samples were not drawn from the highest risk homes as required by the Lead and Copper Rule.

155.    On January 9, 2015, University of Michigan-Flint water tests revealed high lead levels in two locations on campus, causing the university to turn off certain water fountains.

156.    In addition to these events, the City conducted six (6) sampling events on the corrosivity of the "treated" drinking water that occurred either before or concurrently with the creation of reports by the Engineering Defendants. The sampling events were in May, 2014, August 2014, October 2014, and February 2015, May 2015, and August 2015. The sampling results all showed that the drinking water was very corrosive, and yet none of the reports produced by the Engineering Defendants mentioned these sampling results.

**E.  The LAN and Veolia Defendants Were Asked to Evaluate the Problems, But Failed to Do So Properly**

157.    In November of 2014, the LAN Defendants were on actual notice of the need to assess the factors contributing to high TTHM levels following the water source change because the LAN Defendants were engaged to evaluate this issue by Flint and provide a report of its findings, which they did in August of 2015.

158.    The LAN Defendants issued a 20-page Operational Evaluation Report on November 26, 2014, intended to address compliance with EPA and MDEQ operations and

37

regulations. The LAN Defendants entirely failed to address the hazard of lead associated with the corrosive water flowing through the pipes, at least half of which were made of lead.

159.    The Veolia Defendants submitted to Flint their "Response to Invitation to Bid for Water Quality Consultant," Proposal No. 15-573. The Veolia Defendants proposed "to address the immediate reliability and operational needs" of Flint's water system.

160.    Flint had requested engineering services:

    a.    To review and evaluate "the City's water treatment process . . . and procedures to maintain and improve water quality";

    b.    To develop and report with recommendations "to maintain compliance with both State of Michigan and federal agencies"; and

    c.    To assist the City in implementing the recommendations.

161.    The Veolia Defendants, however, responded that "addressing the fundamental issues concerning water quality compliance and operational reliability is much more complex than the recommendations study and advisory services outlined [in City of Flint's request]." The Veolia Defendants proposed to respond to Flint's requested scope of work by:

    a.    Calibrating "daily water quality samples with the City's hydraulic model";

    b.    Refining "the operational strategies for the plant and distribution system";

    c.    Coordinating "daily efforts across plant, operations and maintenance staff"; and

    d.    Alleviating "continued concerns from the public communications process."

162.    In February of 2015, The Veolia Defendants were hired through a resolution that incorporated a standard of performance clause, which stated that "the City is relying upon the professional reputation, experience, certification, and ability of [Veolia]."

163.    The Veolia Defendants' task was to review Flint's public water system, including treatment processes, maintenance procedures, and actions taken. As water treatment professionals, the Veolia Defendants had an opportunity to catch what the LAN Defendants had missed or refused to warn about – corrosive water was being pumped through lead pipes into the homes of Flint residents without corrosion control.

164.    On February 10, 2015, the Veolia Defendants and the City issued a joint press release to the community at large, indicating that Veolia was an "urban water expert" in "handling challenging river water sources" and that it would be evaluating all of the City's water treatment processes.

165.    The press release contained no limitation on the Veolia Defendants' scope of work. David Gadis, the Vice President of Veolia North America's Municipal & Commercial Business stated, "We understand the frustration and urgency in Flint[.] We are honored to support your community with our technical expertise so that together we can ensure water quality for the people of the city of Flint." He continued, "We have extensive experience handling challenging river water sources, reducing leaks and contaminants and in managing discolored water." Based on these representations, the people of Flint had every reason to rely on the Veolia Defendants' subsequent representations of safety.

166.    On February 12, 2015, Rob Nicholas, Veolia's Vice President stated: "We're going to look at the numbers, we're going to look at the plant, we're going to decide how the equipment's functioning, look at the raw water, look at the finished water, decide how it's getting through the pipe to the house, and from that, decide how to fix each of those problems as we go forward."

167.    Despite its representations that it would conduct a thorough, all-encompassing review of the Flint Water system, it took Veolia only 6 days to issue an interim report on its findings, which it presented to a committee of Flint's City Council on February 18, 2015. Per the interim report, the only issue not in the Veolia Defendants' scope of study was "why the change from [Lake Huron water via the Detroit system pipeline to Flint River water] or the history of the utility."

168.    In the interim report, the Veolia Defendants' indicated that Flint's water was "in compliance with drinking water standards." It also noted that "[s]afe [equals] compliance with state and federal standards and required testing." The Veolia Defendants effectively declared publicly that Flint's water was safe.

169.    The Veolia Defendants' interim report also noted that the discoloration in Flint's water "raises questions," but "[d]oesn't mean the water is unsafe." It noted that among the Veolia Defendants' "next steps" were to "carry out more detailed study of initial findings" and "[m]ake recommendations for improving water quality."

170.    In response to potential questions about "[m]edical problems," the Veolia Defendants' interim report dismissively claimed that "[s]ome people may be sensitive to any water."

171.    Veolia issued its final "Water Quality Report" dated March 12, 2015.

172.    In the final report, the Veolia Defendants noted that it had conducted a "160-hour assessment of the water treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget." The final report claims that "a review of water quality records for the time period under our study indicates compliance with State and Federal water quality regulations."

173.   The final report states that "the public has also expressed its frustration of discolored and hard water. Those aesthetic issues have understandably increased the level of concern about the safety of the water. The review of the water quality records during the time of Veolia's study shows the water to be in compliance with State and Federal regulations, and based on those standards, the water is considered to meet drinking water requirements."

174.   Specifically addressing the lack of corrosion control, the final report notes that "[m]any people are frustrated and naturally concerned by the discoloration of the water with what primarily appears to be iron from the old unlined cast iron pipes. The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water. Polyphosphate addition will not make discolored water issues go away. The system has been experiencing a tremendous number of water line breaks the last two winters. Just last week there were more than 14 in one day. Any break, work on broken valves or hydrant flushing will change the flow of water and potentially cause temporary discoloration."

175.   Therefore, in addition to missing the connection between the lack of corrosion control and lead contamination, the Veolia Defendants made a permissive "could" suggestion aimed only at reducing aesthetic deficiencies while suggesting that Flint's drinking water met all applicable requirements and was safe to drink.

176.   In fact, not only did the report fail to discuss lead corrosion, the use of polyphosphate, as suggested, only deals with iron corrosion and could worsen lead corrosion.

177.   As a result of the LAN and Veolia Defendants' actions, the residents of Flint, including Plaintiffs, were exposed to much greater amounts of poisonous water, and for a much longer time.

**F.  The LAN and Veolia Defendants Fail to Conduct a Root Cause Analysis**

178.    Both the LAN and Veolia Defendants were hired to ensure Flint's water system was protective of human health and compliant with federal and state environmental statutes. In February 2015, the LAN Defendants issued their report "Trihalomethane Formation Concern," and on March 12, 2015, the Veolia Defendants issued their report, "Flint Michigan Water Quality Report." Critically absent from both reports was a root cause analysis of why the high TTHM levels existed. A root cause analysis is the standard process used by engineers to determine the origin, case and interrelationship of events. It is a standard practice used by environmental, health, safety and infrastructure engineers whenever an adverse event occurs. Understanding why an event occurred is critical to developing effective recommendations for dealing with an event. It is important to note that a root cause analysis would not have required invasive testing, just consideration of the facts known to date and drawing a conclusion about their interrelationship. Had such an analysis been done, the consultants would have discovered the corrosion of the pipes, and the presence of lead and *legionella* in the water system.

179.    The causal relationship of events leading to the high TTHM levels is not complex science. It is widely known in the scientific community that:

- Road salt from decades of deicing contaminates northern rivers such as the Flint River;

- Road salt contains chloride, which is highly corrosive to steel and lead pipes and that such pipes are used throughout Michigan and Flint;

- Chloride strips pipes of protective surfaces which frees *legionella* and lead;

- Urban rivers contain high levels of E. coli;

- While chlorine is effective in treating E. coli, it becomes far less effective when bare metal has been exposed because the chlorine preferentially reacts with the metal;

- The need to add excessive chlorine is indicates that bare metal has been exposed, and that corrosion is occurring; and

- Excessive chlorination causes high TTHM levels.

180.    The failure of the LAN and Veolia Defendants to conduct a root cause analysis recognizing the corrosion's role in Flint's water problems is truly inexplicable because as detailed above all of these events had been highly publicized before they issued their report:

- The Flint River had been highly impacted by road salt for decades—the river had eight times more salt than water supplied by the DWSD;

- Lead and steel pipes are ubiquitous in the United States, Michigan and Flint;

- In the summer of 2014, Flint suffered one of the worst outbreaks of Legionnaires' disease in U.S. history;

- On October 14, 2014, as widely reported by the press the next day, GM stopped using the City's water because of corrosivity;

- On January 9, 2015, UM Flint shut its water fountains because lead exceed federal standards; and

- In February 2015, if not before, lead in drinking water in other locations also exceed the standards.

181.    Any of these red flags, and indeed the general knowledge in the scientific community, should have alerted the LAN and Veolia Defendants to the extensive corrosion and resultant release of lead and *legionella* in the City's drinking water system.

182.    For example, it should have been obvious to the LAN and Veolia Defendants – as professed experts on water quality and treatment issues – that a small river in an urban environment, such as the Flint River, would be contaminated by chlorides from salt used in road de-icing operations during many Michigan winters. Indeed, in February 2004, the MDEQ, the U.S. Geological Survey ("USGS"), and the City completed an assessment of the Flint River as a possible source of drinking water and concluded that it had a very high susceptibility to potential contamination sources. Moreover, a simple comparison of the chloride levels in the Flint River with that provided by the DWSD, Flint's prior water source, should have quickly alerted LAN

and Veolia to potentially serious corrosion issues as the Flint River contains about eight-times more chloride than the DWSD-supplied water. The Flint River water also had an extremely high chloride-to-sulfate mass ratio ("CSMR") of 1.6. Normally, a CSMR ratio of greater than 0.5 is a cause for serious concern. Had the LAN or Veolia Defendants investigated the chloride-to-sulfate ratio in the Flint River, as would be expected of an engineer of ordinary diligence, they would have immediately had reason to believe that Flint's CSMR posed serious corrosion risks.

183.    The City's inability to effectively treat *E. coli* with chlorine should have likewise alerted the LAN and Veolia Defendants to the existence of corrosion. It is well established by governmental authorities and the scientific community that the inability to treat *E. coli* with chlorine is often caused by heavily corroded piping. According to a study published by the U.S. EPA, high *E. coli* concentrations are a product of corrosion, and the inability to treat *E. coli* with chlorine is caused by corroded pipes. Flint's inability to treat *E. coli* with moderate amounts of chlorine – and the resulting high TTHM concentrations – should have placed the LAN and Veolia Defendants on notice that Flint's pipes were corroding and releasing lead and other materials into the drinking water supply. The uptick in reported cases of Legionnaires' disease, reported during a press conference prior to the LAN and Veolia Defendants' retention, should have put both on notice that Flint's water system exhibited signs of corrosion. *Legionella*, the bacteria that causes Legionnaires' disease, grows on the film on the inside of pipes, which when stripped away by corrosion frees the *legionella* into the drinking water system. Outbreaks of Legionnaires' disease are rare unless pipes have been stripped of their bio-film by warm, corrosive water—which is exactly what exists in the Flint River and water supply. Yet neither the LAN Defendants nor the Veolia Defendants drew a connection between the outbreak and the cause of the outbreak. Nor for

that matter, did they make any recommendations to treat the water to prevent or abate an outbreak.

184.   In addition, it was also very well known in the scientific community that pipes, especially old municipal water service lines, contain lead and that corroded pipes leach lead into the drinking water supply. "Lead has been a challenge and a bane for water suppliers since historical times . . . The numerous articles printed in leading scientific journals, in the United Kingdom and United States, in the late nineteenth century, documenting thousands of cases of lead poisoning caused by lead water pipes, have largely faded in the mist of history. These cases often resulted in death, paralysis, blindness, insanity, convulsions, miscarriages and still births." Dr. Colin Hayes *et al.*, Best Practice Guide on the Control of Lead in Drinking Water, Foreword (Dr. Colin Hayes ed. 2010). As just one of hundreds of examples, a summer 2010 report by the Water Research Foundation stated: "Lead concentrations in tap water are strongly influenced by distribution system water chemistry. In response to changes in water chemistry, high lead concentrations can also be observed in systems with no previous history of a lead problem . . . Solubility and dissolution rates of corrosion products are affected by water chemistry parameters including pH, dissolved inorganic carbon, orthophosphate, and the concentration and type of disinfectant residual." These are the exact conditions that existed in Flint's water supply.

185.   Finally, just the color of Flint's water should have led any reasonable engineer to the conclusion that Flint's pipes were dangerously corroded. The source of Flint's water discoloration was rust, a product of steel and lead corrosion. The presence of rust in the water should have alerted LAN and Veolia that Flint's water was corroding its pipes, and that there was thus a danger that lead was leaching into the Flint water system.

## G.  The LAN and Veolia Defendants' Conclusions Made the Crisis Worse

186.    Concern over lead concentrations in drinking water motivated the passage of the Lead and Copper Rule (LCR) in 1991, which requires utilities to implement methods to control lead corrosion if the 90th percentile of samples exceeds the action level of 0.015 mg/L. *See* 40 C.F.R. pt. 141, sub. E and I. Flint's own sampling analysis indicated that its system violated the LCR standards. Nevertheless, the Veolia Defendants, while failing to conduct any analysis, knowingly made the false statement in their March 12, 2015 report that their "review of water quality records for the time period under our study indicates compliance with State and Federal water regulations."

187.    Another reason for the corrosion of pipes is the drinking water's acidity. It is well known that the decay of pathogens and other organic materials such as those found in the Flint River causes water to become more acidic.

188.    It is also well known to water quality engineers that the addition of acidic water quality treatment chemicals, such as ferric chloride which is used as a coagulant to settle out particles at the water treatment plant, can further increase the water's acidity. According to U.S. EPA, "[i]f the raw water for a utility has a relatively high concentration of chloride and a history of lead corrosion problems, coagulants that add to chloride concentration should be avoided. Also, since a lower pH will increase corrosion in almost all cases, a utility should consider the finished water pH goal before implementing enhanced coagulation."

189.    The Veolia Defendants should have recommended maintaining the drinking water's neutral pH by adding phosphate, but instead, in direct contradiction of federal authorities, recommended increasing the dosage of ferric chloride – a very potent, corrosive acid, rather than advising that the pH of the water should be increased.

190.    According to the Centers for Disease Control and Prevention:

Chemical additives are added to water during the water treatment process. More than 40 chemical additives can be used to treat drinking water. Many of these commonly used additives are acidic, such as ferric chloride and aluminum sulfate, which are added to remove turbidity and other particulate matter. . . . These acidic water treatment additives can interfere with corrosion protection. . . . Lead and copper are rarely detected in most drinking water supplies. However, these metals are a concern to consumers. Because some household plumbing fixtures may contain lead or copper, corrosive waters may leach (pick up) lead and copper from household plumbing pipes after entering a home. . . . The most common reason for water utilities to add corrosion inhibitors is to avoid lead and copper corrosion with older homes, and the second most common reason is to minimize corrosion of pipes in the distribution system. . . . The tendency of water to be corrosive is controlled principally by monitoring or adjusting the pH, buffer intensity, alkalinity, and concentrations of calcium, magnesium, phosphates, and silicates in the water.

191.    Yet the Veolia Defendants did not recommend that the City take steps to institute corrosion control to prevent lead and *legionella* from spreading throughout the City's water supply. The Veolia Defendants merely suggested the implementation of corrosion control (here the addition of phosphates or other corrosion controls) as a *possible*, but not wholly effective means for minimizing *water discoloration*. There was no mention of the need to add corrosion control to prevent the release of lead and *legionella*. The Veolia Defendants' report states, "The water system *could* add a polyphosphate to the water as a way to minimize the amount of *discolored water.*" (Emphasis added). The report explains that, "Polyphosphate addition will not make *discolored water* issues go away." (Emphasis added). Thus, rather than recognizing that corrosion control was *required* to render Flint's water system compliant with federal regulations and prevent catastrophic corrosion, the Veolia Defendants merely suggested adding phosphate to address water discoloration. Even the Veolia Defendants' *suggested* dosage to address discoloration, 0.5 mg/L was far too low. In February 2016, the City was adding four to eight times as much phosphate, 2 to 4 mg/L.

47

192.    Even worse, The Veolia Defendants presented their conclusion that no efforts needed to be undertaken to maintain the neutrality of the water supply as a scientific certainty. Their March 2015 report stated that prior to arriving at their conclusions, the Veolia Defendants undertook "laboratory testing" and concluded that, "[c]urrent ferric chloride dosages are too low and dosages of 100 mg/L or more are recommended." The Veolia Defendants acknowledged that their recommended increase was significant: "This increase to 100 mg/L is twice what is currently being fed and much higher than what had previously been fed last year." Instead, the Veolia Defendants should have advised that the pH of the water should be increased.

193.    At the same time that the Veolia Defendants gave the unqualified opinion that the current dosage is "too low," and should be doubled, the Veolia Defendants knew that the City had no corrosion control protocol and knew (or should have known) that significant corrosion was already occurring. The Veolia Defendants' directive that the City double its dosage of ferric chloride was unqualified and in no way warned that acidic water would increase corrosion. Instead, it should have advised that the pH of the water should be increased.

194.    In August, 2015, the LAN Defendants made the same recommendation to increase the dose of ferric chloride, rather than advising that the pH of the water should be increased.

195.    The LAN and Veolia Defendants should have told the City to *reduce* the concentration of ferric chloride, and that adding phosphate as a pH buffer was *mandatory*. No such recommendation was made, and as a result, the lead and *legionella* courses through the City's water supply to this day.

196.    A graph prepared by the Flint Water Study Group from Virginia Tech University shows that the pH of Flint's water distribution system became more acidic after the Veolia Report was issued in March, even as the pH in the Flint River became less acidic:



197.    The graph above shows that the Flint River had a harmless pH at or above 8.0 for all of 2015, and steadily increased after June. By comparison, the graph shows that the pH in Flint's municipal water supply started dropping steadily from 7.9 in March (just after the Veolia Defendants made their recommendation to double the ferric chloride concentration) to 7.3 in August. This difference is significant. pH is measured on a logarithmic scale, meaning that a pH of one whole number, such as 7.0 is ten times more corrosive than a pH of another whole number, such as 8.0. The drop in pH from 7.9 to 7.3 indicates a dramatic increase in the corrosivity of Flint's water.

198.    The graph above is punctuated with quotes from Defendants' emails and other documents that illustrate the contradictory information provided by State officials regarding the existence of corrosion control measures and lead in Flint's drinking water.

199.    On June 24, 2015, the U.S. EPA reached a similar conclusion about the City's addition of ferric chloride:

> In addition, following the switch to using the Flint River, the City of Flint began adding *ferric chloride*, a coagulant used to improve the removal of organic matter, as part of the strategy to reduce the TTHM levels. Studies have shown that an increase in the *chloride-to-sulfate* mass ratio in the water can adversely affect lead levels by *increasing the galvanic corrosion of lead in the plumbing network*.

Memorandum, High Lead Levels in Flint, Michigan - Interim Report, from Miguel A. Del Toral,

Regulations Manager, Ground Water and Drinking Water Branch, to Thomas Poy, Chief Ground Water and Drinking Water Branch (June 24, 2015) (hereinafter "Del Toral Report") (emphasis added).

200.    In December, 2016, Dr. Susan Masten, American Water Works Journal, published *"Flint Water Crisis: What happened and Why?"* Dr. Masten conducted a detailed analysis of the chemistry and engineering behind what happened to Flint's water and examined why the water was corrosive. Dr. Maston concluded that the ferric chloride caused chloride (i.e., salt) levels in the drinking water to be 28-100% higher than Flint River water. Based on these results, it is apparent that the LAN and Veolia Defendants should have advised the City to reduce the levels of ferric chloride, which neither firm did.

201.    Both the LAN and Veolia Defendants analyzed the pH in Flint's water. Both made recommendations about the addition of chemicals that affect pH. Both were reckless and negligent in their analysis of the pH and their recommendations. Had the City started adding polyphosphate or otherwise controlled for corrosion, or decreased the dosage of ferric chloride, less lead and *legionella* would have been released into Flint's water supply.

### H. Despite the Numerous Signs of the Growing Crisis, the Government Defendants Failed to Act, and Concealed Known Dangers From the Plaintiffs

202.    In January 2015, State officials met to discuss the ongoing threat to public health posed by the *legionella* bacteria in the Flint River water. The Governor and his staff, the Genesee Co. Health Department, and the MDHHS had already been aware for at least three months of the ongoing public health threat to the people of Flint, including the threat of Legionnaires' disease resulting from the use of the Flint River water, yet they had done nothing. The public health crisis was not addressed in any serious and/or non-frivolous way.

203.   On January 13, 2015, Earley resigned his position as Emergency Manager and the Governor replaced him with Gerald Ambrose.

204.   On January 21, 2105, State officials ordered water coolers to be installed in State buildings operating in Flint. State officials were concerned that this action, if it became widely known by the public, would reveal their dishonesty because they had been advising the residents of Flint that it was safe to drink the tap water and at the same time arranging for alternative water sources for the State employees who were working in Flint.

205.   On January 27, 2015, Flint was placed on notice that the Genesee County Health Department ("GCHD") believed there was an association between the spike in Legionnaires' disease reports and the onset of the use of Flint River water. Again, Defendants did nothing about the impending health catastrophe.

206.   On January 29, 2015, State officials recognized that the public health crisis was caused by the corrosion of the entire infrastructure of the Flint water system. No action was taken to warn the public of the health crisis or to correct the harm caused by the State's decision to switch from DWSD water to Flint River water.

207.   On January 29, 2015, Sue McCormick, the Director of DWSD, offered Ambrose an opportunity to purchase DWSD water at attractive rates. DSWD's proposal included waiving the re-connection fee. This offer was rejected by Ambrose.

208.   In January 2015, Flint home owner, LeeAnn Walters, called the EPA regarding water issues that she was experiencing at her Flint home. She informed the EPA that she and her family members were becoming physically ill from exposure to the Flint River water coming from her tap.

209.    By the end of January 2015, the Governor's office was fully aware of the public health emergency caused by the rise in *legionella* bacteria found in the Flint River and launched a cover-up of the public health crisis.

210.    On February 1, 2015, the Governor was fully informed of the health crisis in Flint. Given the months of complaints from Flint water users that the water was discolored, foul smelling/tasting and making them visibly sick, the Governor knew that there was an imminent threat to the people of Flint. Yet, neither the Governor, nor State and local public officials, took corrective action.

211.    On February 17, 2015, Flint water users staged public demonstrations demanding that Flint re-connect with DWSD. Once again Ambrose refused to restore Detroit water for Flint water users. State and local public officials falsely insisted that the water was acceptable for use and took no action.

212.    On February 26, 2015, Jennifer Crooks of the EPA wrote an email to MDEQ and EPA representatives. Crooks noted that Walters complained of "black sediment in her water." She noted that the iron contamination was so high that the testing instrumentation could not measure it. Crooks wrote, ""But, because the iron levels were so high [Michael Glasgow, Flint Utilities Administrator], suggested testing for lead and copper. WOW!!!! Did he find the LEAD! **104 ppb.** She has 2 children under the age of 3….Big worries here….I think Lead is a good indication that other contaminants are also present in the tap water that obviously were not present in the compliance samples taken at the plant…We also talked about Dr. Joan Rose from Michigan State being on the Flint Tech Advisory committee--would want to dive further into this…she and her family are also exhibiting the rashes when exposed to the water, and her daughter's hair is falling out in clumps."

213.    In a second email on February 26, 2015, Crooks stated that Miguel Del Toral of the EPA is of the opinion that the "black sediment" in the Walters water was actually lead. She continued, "Miguel is wondering if Flint is feeding Phosphates. Flint must have Optimal Corrosion Control Treatment-is it phosphates? From a public health perspective, can we assume that the high lead levels in Mrs. Walters' neighborhood are isolated to just her area? Or are they more widespread?"

214.    On February 27, 2015, Stephen Busch advised Del Toral that the City was using corrosion control. This statement was false and Busch knew it was false when he made this statement to the EPA.

215.    On March 5, 2015, the Governor and officials in the Governor's office realized that they had a massive public health emergency which *probably included widespread lead poisoning* on their hands and began discussing distributing water filters to Flint water users. These public officials took no action to warn or otherwise protect Plaintiffs, and continued to conceal from them and the public the true nature, extent and severity of the public health crisis.

216.    By March 10, 2015, James Henry of the GCHD raised concerns that he was being stonewalled by the State and City in accessing public health information about the Legionnaires' disease outbreak in Genesee County. The concealment of the public health emergency by City and State officials – Defendants herein – was shocking and unconscionable.

217.    As of March 10, 2015, the Defendants knew that the extreme public health emergency involved lead poisoning, deadly legionella bacteria and a host of other ailments.

218.    On March 25, 2015, Flint City Council voted to re-connect to Detroit's water system. Governor Snyder's appointed Emergency Manager, Gerald Ambrose, exacerbated the State-created danger by rejecting this vote of the Flint public officials.

219.    On June 24, 2015, the aforementioned Del Toral Report warned of "High Lead Levels in Flint Michigan." On the following day, Del Toral wrote an internal email with respect to the elevated lead in Flint water at EPA stating:

> "I understand that this is not a comfortable situation, but the State is complicit in this and the public has a right to know what they are doing because it is their children that are being harmed."

Del Toral further warned that the failure to inform Flint water users of the elevated lead levels was "bordering on criminal neglect."

220.    The Del Toral Report was shared with, among others, MDEQ's Chief of Office of Drinking Water and Municipal Assistance, Liane Shekter-Smith, MDEQ's Water Treatment Specialist, Patrick Cook, MDEQ's District Supervisor, Stephen Busch, and MDEQ's Engineer assigned to District 11 (Genesee County), and Michael Prysby.

221.    Nonetheless, State and local public officials failed to undertake any measures to effectively address any of the dangers, including lead poisoning, identified by Del Toral.

222.    On June 30, 2015, Mayor Walling notified EPA Region 5 Director, Dr. Susan Hedman ("Hedman") that Del Toral was speaking publicly about the Flint environmental crisis.

223.    On July 2, 2015, Hedman advised Walling that he was given a preliminary draft and that it would be premature to draw any conclusions.

224.    On July 10, 2015, MDEQ official Brad Wurfel, in an effort to conceal the public health crisis, appeared on public radio and advised listeners that Flint water was safe and that it was not causing "any broad problem" with lead leaching into residential water. Parents, worried

about the lead poisoning of their children demanded answers from Wurfel. He told the concerned parents, "*[l]et me start here-anyone who is concerned about lead in the drinking water can relax."* Wurfel, at the time he made this statement, knew his statements were false and he deliberately misled the public about the seriousness of the crisis.

225.   By July 2015, multiple agencies within the State of Michigan, including the Governor, the Governor's Office and MDEQ, had actual notice of high lead exposure and other dangers, including Legionnaires' disease, associated with Flint water.

226.   On July 22, 2015, Governor Snyder's Chief of Staff, Dennis Muchmore, wrote to MDHHS Director Lyon and stated that the Plaintiffs' concerns regarding lead poisoning and other dangers were being "blown off" by the Defendants.

227.   On July 24, 2015, Wurfel continued to promote the cover-up of the health crisis. In response to the recognition that the Defendants were blatantly ignoring the concerns of Flint residents, he stated, "In terms of near-future issues, the bottom line is that residents of Flint do not need to worry about lead in their water supply, and DEQ's recent sampling does not indicate an imminent health threat from lead or copper."

228.   In August 2015, Professor Marc Edwards of Virginia Tech determined that there was serious lead contamination of the Flint water system and stated that the people of Flint face a major public health emergency.

229.   Wurfel, speaking for the State, immediately dismissed and discredited Edwards by stating that Edwards's team "only just arrived in town and (have) quickly proven the theory they set out to prove, and while the state appreciates academic participation in this discussion, offering broad, dire public health advice based on some quick testing could be seen as fanning political flames irresponsibly."

230.    By late 2014 or early 2015, Lyon was aware from MDHHS data that there was a dramatic increase in the percentage of Flint children with elevated blood lead level readings from blood drawn during the second and third quarters of 2014, and that Legionnaires' disease was on the rise during the same period of time. Lyon was aware of this dangerous condition but did nothing to report the findings to the Plaintiffs or the public.

231.    Lyon knew that these elevated blood lead levels, and an increase of Legionnaires' disease found in its own database, correlated with the introduction of the corrosive Flint River water into the Flint water distribution system. Lyon did not order that any action be taken to warn the public.

232.    The increase in elevated blood lead levels in Flint's children, and Lyon's failure to do anything to prevent further injury to the people of Flint, identifies yet another aspect of this unconscionable government-created health and public safety emergency. Lyon, aware of the elevated blood lead levels in Flint's children, failed to report the evidence to the MDEQ, Governor's Office, EPA or the Flint community. His concealment of this critical information increased the risk and exacerbated the danger.

233.    Dr. Mona Hanna-Attisha, in the summer of 2015, using data available to her from Hurley Hospital, observed a similar spike in the percentage of Flint children with elevated blood lead levels from blood drawn in the second and third quarter of 2014. She published her study in an effort to alert the community about the health risks associated with drinking Flint River water.

234.    The Defendants and the MDHHS immediately accused Dr. Hanna-Attisha of providing false information to the public.

235.    In September 2015, the MDEQ continued to falsely assure the public that use of Flint Water was safe and continued to deny the public health crisis at hand. For example, a a

MDEQ document entitled, "DEQ Frequently Asked Questions, Water Lead Levels in the City of Flint, September, 2015" which stated: "Are there other ways the city monitors for lead exposure? The County Health Departments, overseen statewide by the Michigan Department of Health and Human Services, *regularly monitors blood levels* in children throughout Michigan communities. The *leading cause of lead poisoning is exposure to lead paint*. Blood lead level testing results for the 12-month period just after the City of Flint changed its water source (May 2014 – April 2015) *showed no significant change* in the pattern of blood lead levels in Flint, compared to the previous three years. This data *suggests the recent change in water source by the City of Flint has not contributed to an increase in lead exposure* throughout the community." (emphasis added).

236.   On September 25, 2015, Wurfel falsely advised media and the public that MDHHS officials have re-examined its blood lead level data and the MDHHS statistics do not show the same upward trend documented by Dr. Hanna-Attisha.

237.   On September 28, 2015, Wurfel stated publically that the Flint water crisis was becoming "near-hysteria" because of Dr. Hanna-Attisha's report. He said that he wouldn't call her reports "irresponsible. I would call them unfortunate." Wurfel finished his remarks that day by falsely stating that "Flint's drinking water is safe in that it's meeting state and federal standards."

238.   On September 29, 2015, Wurfel referred to EPA Del Toral of the EPA as a "rogue employee."

239.   By late September 2015, reconnecting to the Detroit water system was the only reasonable option to protect the health and safety of the Flint water users. Yet the State deliberately chose not to proceed in this fashion. Instead, on or about October 2, 2015, State

officials announced that the State would appoint a Flint Water Advisory Task Force and would provide water filters designed to eliminate the lead in the water to Flint water users.

240.    On October 8, 2015, the Governor recognized that he could no longer pretend that the water from the Flint River was safe. He finally ordered Flint to re-connect with the Detroit water system which contained corrosion control chemicals.

241.    The re-connect to DWSD took place on or about October 16, 2015.

242.    Flint is currently in a State of Emergency: Mayor Karen Weaver declared a State of Emergency on December 14, 2015. On January 4, 2016, the Genesee County Commissioners declared a State of Emergency. On January 5, 2016, Governor Snyder declared a State of Emergency. On January 13, 2016, the Governor activated the Michigan National Guard to assist the people of Flint. On January 14, 2016, the Governor asked President Barak Obama and the Department of Homeland Security, Federal Emergency Management Agency ("FEMA") to declare Flint a Major Disaster. On January 16, 2016, FEMA issued an emergency declaration to assist the people of Flint.

243.    The relief efforts of State public officials have been ineffective, indeed often frivolous, in mitigating the devastation caused by its creation of the public health crisis. The ineffective relief efforts have prolonged the dangerous conditions and, in many cases, the failed mitigation efforts have further exacerbated the effects of the public health calamity created by the State.

**I.   Defendants' Misconduct Has Caused the Plaintiffs to Suffer Devastating Health Effects and Other Personal Injuries**

244.    As a result of the failure to properly treat water from the Flint River, corrosive water was delivered throughout the Flint Water System. The water predictably corroded metal

pipes, causing them to leach lead into the water. An estimated 15,000 of Flint's 30,000 residential service lines are composed at least partially of lead. The exact number is presently unknown.

245.    Lead's catastrophic effects are indisputable. According to the EPA, "[y]oung children, infants, and fetuses are particularly vulnerable to lead because the physical and behavioral effects of lead occur at lower exposure levels in children than in adults. A dose of lead that would have little effect on an adult can have a significant effect on a child. In children, low levels of exposure have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells."

246.    According to the World Health Organization, "lead affects children's brain development resulting in reduced intelligence quotient (IQ), behavioral changes such as shortening of attention span and increased antisocial behavior, and reduced educational attainment. Lead exposure also causes anemia, hypertension, renal impairment, immunotoxicity and toxicity to the reproductive organs. The neurological and behavioral effects of lead are believed to be irreversible."

247.    Lead is so harmful that, according to the EPA, "ingestion of lead can cause seizures, coma and even death."

248.    The effects of lead exposure are long lasting. The EPA has explained that, "[l]ead can accumulate in our bodies over time, where it is stored in bones along with calcium. During pregnancy, lead is released from bones as maternal calcium and is used to help from the bones of the fetus. Lead can also cross the placental barrier exposing the fetus to lead. This can result in serious effects to the mother and her developing fetus, including: reduced growth of the fetus [and] premature birth."

249.    Tragically, the damage from lead exposure to Flint's children includes diminished potential over the entire course of their lives. The World Health Organization states, "[t]hese costs are sometimes referred to as *lost opportunity costs.* Using a conservative estimate, the decrease in intelligence attractable to each 1 μg/dl increase in blood lead level is 0.25 IQ points, and the decrement in lifetime economic productivity associated with lost IQ point is 2.4%. When exposure to lead is widespread in a society, the aggregate loss of intelligence (and thus economic productivity) can be substantial."

250.    Notably, this estimate is conservative as it relates solely to lost earning potential and does not include costs related to special educational, medical, sociological, disability and occupational services, or long-term monitoring and treatment costs.

251.    According to an analysis of the economic losses attributable to lead exposure in 2009, "[t]he present value of Michigan's economic losses attributable to lead exposure in the 2009 cohort of 5 year-olds ranges from $3.19 billion (using U.S. blood lead levels) to $4.85 billion (using Michigan blood lead levels) per year in loss of future lifetime earnings."

252.    Other researchers have estimated the economic impact of childhood lead poisoning to be as high as $50.9 billion per year in lost economic productivity resulting from reduced cognitive potential from preventable childhood lead exposure.

253.    As a direct and proximate result of Defendants' misconduct, Flint's children have suffered specific, measurable damages in the form of lost earning potential. They have also incurred damages in the form of required special educational, medical, sociological, occupational and disability services and related education assistance programs.

254.    Lead is also harmful to adults. The EPA warns that "[a]dults exposed to lead can suffer from: Cardiovascular effects, increased blood pressure and incidence of hypertension,

[d]ecreased kidney function, [and] [r]eproductive problems (in both men and women)." The World Health Organization explains that the direct medical costs of lead exposure include treatment for acute lead poisoning – typically chelation therapy – as well as the treatment of cardiovascular disease in adults who develop hypertension following lead exposure.

255. Given the long-lasting risks of lead exposure and the potential for lead sediment to be disturbed and re-mobilized into the water system, Plaintiffs will require regular medical and tap water testing and evaluation, at bare minimum, in accordance with government standards.

256. Additionally, as described more fully above, the water crisis in Flint caused an outbreak of Legionnaires' disease. As explained above, the presence of *legionella* was a direct and proximate result of the switch to the Flint River as a water source and related conduct. At least 87 Flint residents contracted Legionnaires' disease and at least nine died. Those residents who became infected with Legionnaires' disease suffered death, and for those who lived, incurred pain and suffering as well as substantial medical costs due to Defendants' conduct. At least one case of Legionnaires' Disease occurred in 2016, even after the City's water supply was switched back to the DWDS, indicated that the disease still poses a risk to the community.

257. In October, 2016, Flint and Michigan authorities determined that Flint was experiencing an outbreak of the infectious bacterial disease called Shigellosis, which can cause bloody diarrhea and fever. Shigellosis is caused by the Shigella bacteria, and its symptoms include fever, abdominal pain and diarrhea, which can lead to dehydration. Since the water crisis, there has been a steady increase of cases, especially in children. The youngest person diagnosed was 17 months old.

258. Finally, as a direct and proximate result of Defendants' conduct, Plaintiffs have suffered extreme emotional distress.

**J. Defendants' Misconduct Has Also Caused the Plaintiffs to Suffer Extensive Property Damage and Monetary Losses.**

259.    In addition to the devastating health effects and lost economic productivity caused by lead exposure, Defendants' misconduct has caused significant property damage and monetary losses.

260.    The property damages sustained by Plaintiffs fall into three basic categories. First, the Plaintiffs' pipes and appliances themselves have corroded, shortening their life span, and causing further damage when they break. Second, the corroded pipes and appliances remain a continuing source of lead and potentially *legionella* – thus, pipes and appliances must be replaced or else remain a continuing source of harmful exposure. Finally, the value of Plaintiffs' real property has been substantially diminished as a result of the continuing questionable safety of Flint's water and existence of corroded pipes and appliances.

261.    Although the City has begun adding polyphosphate to its system to reduce the leaching of lead from its service lines, this is unlikely to render Flint's water safe because many of the pipes have become so corroded that not even phosphate will be able to fully encapsulate the surface of the pipes and prevent lead from leaching into the water supply.

262.    The Plaintiffs' homes and properties have been affected in the same fashion. Even with the addition of phosphate, their pipes and appliances will remain corroded until replaced, and continue to be a source of lead and potentially *legionella*. Solubilized and particulate lead and *legionella* remain in portions of the piping system and appliances, and can become remobilized at any time, causing further damage and health effects.

263.    The effect of corrosive water on residential and commercial piping and appliances is well understood. For example, a 2014 study by the Water Research Watershed Center stated: "[w]ith respect to the corrosion potential of YOUR drinking water, the primary concerns include

the potential presence of TOXIC Metals, such as lead and copper; deterioration and damage to the household plumbing, and aesthetic problems such as: stained laundry, bitter taste, and greenish-blue stains around basins and drains."

264.   The Water Research Watershed Center has further explained that, "The cost of corrosion can be expensive. Corrosion can impact you and your family's health, aesthetic quality of your water, waste money, and damage your household piping and fixtures."

265.   Not only does corrosion cause the "premature failure of household plumbing and plumbing fixtures," the Water Research Watershed Center has explained, corrosion also "decreases the efficiency of hot water heaters and may cause premature failure to the heater."

266.   On January 10, 2017, Marc Edwards, the principal scientist who discovered the high lead concentration in Flint water, published "*Flint Water Crisis Caused By Interrupted Corrosion Control: Investigating "Ground Zero Home*" in which he concluded that the lead in the homes originated in part from rust stripped by the corrosive water from galvanized pipes. Galvanized pipes are in people's homes. Although galvanized (zinc-coated) pipe is still considered to be a safe transport material for drinking water, there are some potential health concerns if the water supply is corrosive due to its acidic condition (low pH). These results establish that the pipes in the pipes and appliances in Flint homes and businesses need to be replaced.

267.   Moreover, residents and property owners have already reported damage to major appliances such as dishwashers and washing machines following Flint's decision to switch water sources.

268.   According to emails from Governor Snyder's office, the State estimates that replacing Residents' pipes alone could cost between $6,000 and $8,000 per household. Other

estimates of those replacement costs are far higher. Obviously, the cost to replace pipes in a residential building with multiple units will be far higher, costing tens and hundreds of thousands of dollars.

269.    Corroded pipes not only present a continuing health threat, they risk further damage to one's property because corrosion can result in deep pits in the pipe or tank walls that can eventually break, causing substantial water damage to homes and businesses.

270.    Although the City has stated it intends to begin replacing some City-owned pipes, this is far from sufficient to render Flint's water safe. Sergio Kapusta, a fellow at NACE International, an industry organization that develops corrosion prevention and control standards in Houston, has explained that "changing all the mains in the city will not really solve the problem for the homeowners" because the lead piping in these homes probably has been severely compromised. "The corrosion is not going away. It's still there."

271.    Plaintiffs have been left to pay for the damage caused by the Engineering and Governmental Defendants. This has proven nearly impossible as many of the City's residents survive on very little money. To make matters worse, the Washington Post has reported that, "many in Flint say banks are refusing to offer refinancing that could free up money to pay for the retrofitting, and that the costs are not covered by insurance. The crisis has created a perfect storm to strip their houses of their remaining value, they say."

272.    Moreover, the problems associated with Flint's water have had and are having a significant impact on residential and commercial property values and rental rates in the City. As Daniel Jacobs, an executive with Michigan Mutual explained, "[t]he tragedy is an already depressed community is now likely to see housing values plummet not only because of the hazardous water, but because folks cannot obtain financing."

273.    Certain banks and mortgage companies have refused to make loans, unless the borrower establishes that its water is potable. A Wells Fargo & Co. spokeswoman said it is reviewing government lending guidelines: "[u]ntil [water] testing and potability is affirmed, it will be difficult to lend," said the spokeswoman, who said such difficulties would apply to all lenders. Representatives from Bank of America and J.P. Morgan similarly have acknowledged requiring verification of potable water to provide financing to Flint residents. Lenders claim their hands are tied. As the Federal Housing Administration, which backs loans to less-creditworthy borrowers, explained, government regulations require "a continuing and sufficient supply of safe and potable water" to provide home financing.

274.    This creates a catch-22. Despite having switched back to receiving its water from DWSD, the current extent of corrosion in Flint renders the water unsafe because the pipes and appliances will remain corroded and sources of lead until they are replaced. However, Plaintiffs, including residents and property owners, cannot obtain financing to replace their pipes and appliances until the water is deemed safe.

### COUNT I-CAUSE OF ACTION
### 42 U.S.C. § 1983 – 14th AMENDMENT
### SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER: ALL PLAINTIFFS AGAINST GOVERNMENT DEFENDANTS

275.    The Individual Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

276.    Individual Plaintiffs have a clearly established right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to be protected from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law.

277.   The Government Defendants, while acting under color of state law, affirmatively created or exacerbated the dangers and dangerous situations to which Plaintiffs were exposed, making them more vulnerable to said dangers, and the Government Defendants did so with an extreme degree of culpability.

278.   The Government Defendants, while acting under color of state law, affirmatively continued, increased and perpetuated the dangers, risks of harm and dangerous situations creating the public health crisis, when they deliberately and affirmatively denied, lied about, covered up, deceived, discredited and ignored said known dangers and risks of harm to which they exposed Plaintiffs making them more vulnerable to said dangers.

279.   The Government Defendants were aware that their conduct could result in the deprivation of Plaintiffs' due process rights to be protected from the dangers, dangerous situations, or being made more vulnerable to the dangers affirmatively created and perpetuated by them.

280.   This conduct was reckless, deliberately indifferent and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as the Government Defendants knew of and disregarded the substantial risk of serious harm to Individual Plaintiffs.

281.   The dangers and risks of harm were discreet and special to Individual Plaintiffs, as Flint water users and property owners in particular, and not risks affecting the public at large.

282.   The dangers and risks of harm to Individual Plaintiffs from the ongoing exposure to the water toxins which were created and perpetuated by the Government Defendants, were so extreme as to be equivalent to private acts of violence visited upon them.

283.    These actions of the Government Defendants constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional and economic harm to the Individual Plaintiffs.

284.    As a direct and proximate result of the unconstitutional acts of the Government Defendants as alleged in this First Amended Complaint, Individual Plaintiffs suffered violations of their fundamental rights to bodily integrity, property and liberty interests, including, but not limited to:

    a.    Serious and in some cases life threatening and irreversible bodily injury;

    b.    Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

    c.    Pain and suffering;

    d.    Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

285.    Individual Plaintiffs have further suffered property damage to their homes and/or places of business in the form of lost property values and lost business profits. The conduct of the Government Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

### COUNT II-CAUSE OF ACTION
### 42 U.S.C. § 1983 – 14th AMENDMENT
### SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY:
### ALL PLAINTIFFS AGAISNT GOVERNMENT DEFENDANTS

286.    Individual Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

287.    Individual Plaintiffs have a clearly established fundamental right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to bodily integrity.

288.     The conduct of the Government Defendants, all while acting under color of law, endangered and/or threatened Plaintiffs' fundamental liberty interest to bodily integrity as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

289.     The Government Defendants were aware that their conduct could result in the deprivation of Individual Plaintiffs' fundamental due process rights to bodily integrity.

290.     The Government Defendants deliberately and knowingly breached the constitutionally protected bodily integrity of Individual Plaintiffs by creating and perpetuating the ongoing exposure to contaminated water, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Individual Plaintiffs.

291.     The Government Defendants had the opportunity to reflect and deliberate before they acted and/or failed to act.

292.     As a direct and proximate result of the unconstitutional acts of the Government Defendants as alleged in this First Amended Complaint, Individual Plaintiffs have suffered violations of their fundamental rights to bodily integrity, property and liberty interests, including, but not limited to:

> a.     Serious and in some cases life threatening and irreversible bodily injury;
>
> b.     Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;
>
> c.     Pain and suffering;
>
> d.     Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

293.     The conduct of the Government Defendants was both reckless  and outrageous, entitling  Individual Plaintiffs to an award of punitive damages, as well as costs and reasonable

attorney fees, pursuant to 42 U.S.C. §1988, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT III-CAUSE OF ACTION
### 42 U.S.C. § 1983 – 5th AND 14th AMENDMENTS
### EQUAL PROTECTION OF THE LAW: RACE-BASED
### ALL PLAINTIFFS AGAINST SNYDER, DILLON, WRIGHT, WALLING, AMBROSE, KURTZ & EARLEY

294.   Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

295.   Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz and Earley, acting under color of law, and in their respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution

296.   Amendment Fourteen, § 1 states in pertinent part, "No state shall make or enforce any law which shall … deny to any person within its jurisdiction the equal protection of the laws."

297.   The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

298.   Defendants' conduct deliberately exposed Plaintiffs to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

299.   In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational.)

300.    These Defendants knew that the water from the Flint River was grossly inferior to the Lake Huron water Flint and Genesee County citizens had been receiving from DWSD.

301.    These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP which would have required millions of dollars of upgrades.

302.    These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

303.    Recognizing these facts, Defendants devised an Interim Plan that caused the predominately white water users of those areas of Genesee County outside of Flint to receive the safe and superior water from DWSD, whereas the water users of predominantly African American Flint received water that was known to be grossly inferior and unsafe, i.e. Flint River water.

304.    As evidence of the fact that race discrimination was the reason for treating the two groups of water users differently, the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less than the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

305.    Given the clear difference in the treatment between these two groups of similarly situated water users, the deliberate and intentional decisions and actions of these Defendants in devising the Interim Plan was the product of racial discrimination in violation of the Equal Protection Clause.

306.    If Plaintiffs' community had been predominately white, Plaintiffs would have been treated in the same manner as their predominantly white neighbors in Genesee County and they too would have received DWSD water as part of the Interim Plan.

307.    Because Plaintiffs were water users in a predominately African American community, their complaints were dismissed and disrespected as exaggerated, without merit or inconsequential. If Plaintiffs' community had been predominately white, citizen complaints would have been taken seriously, treated as valid and the MDEQ and Flint public officials would have taken timely action to address the concerns.

308.    As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this First Amended Complaint, Plaintiffs have suffered violations of their fundamental constitutional rights including, but not limited to:

     a.    Serious and in some cases life threatening and irreversible bodily injury;

     b.    Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

     c.    Pain and suffering;

     d.    Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

309.    The conduct of Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

**COUNT IV-CAUSE OF ACTION**
**42 U.S.C. § 1983 – 5th AND 14th AMENDMENTS**
**EQUAL PROTECTION OF THE LAW: WEALTH-BASED**
**ALL PLAINTIFFS AGAINST SNYDER, DILLON, WRIGHT, WALLING,**
**AMBROSE, KURTZ & EARLEY**

310.    Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

311.    Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz and Earley, acting under color of law, and in their respective individual and/or official capacities, engaged in conduct

and/or adopted laws and policies that violated Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution.

312.   Amendment Fourteen, § 1 states in pertinent part, "No state shall make or enforce any law which shall … deny to any person within its jurisdiction the equal protection of the laws."

313.   The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

314.   Defendants' conduct deliberately exposed Plaintiffs to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

315.   In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational.)

316.   These Defendants knew that the water from the Flint River was grossly inferior to the water Flint and Genesee County citizens had been receiving from DWSD.

317.   These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP which required millions of dollars of upgrades.

318.   These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

319.   Recognizing these facts, Defendants' devised an Interim Plan that allowed the predominately more affluent water users of Genesee County to receive the safe superior water from DWSD and the predominately impoverished water users of Flint would have to accept during the interim period grossly inferior, previously rejected and dangerous Flint River water.

72

320.    There was no rational economic or fiscal justification for treating the predominately more affluent water users of Genesee County differently than the predominately impoverished water users of Flint because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

321.    Given the unexplained difference in treatment between these two groups of similarly situated water users, considering the absence of any rational economic justification, and taking into account the economic and class makeup of the group which received the grossly inferior and dangerous water product, the deliberate decisions and actions of these Defendants in devising the Interim Plan can fairly be said to be the product of income and class discrimination, in violation of the Equal Protection Clause of the 14th Amendment.

322.    If Plaintiffs' community had been predominately more affluent, Plaintiffs would have been treated just like their more affluent neighbors in Genesee County, and they too would have received DWSD water as part of the Interim Plan.

323.    Because Plaintiffs were in a predominately impoverished community, their complaints were dismissed as exaggerated, without merit or inconsequential. If Plaintiffs' community had been predominately more affluent, citizen complaints would have been treated as valid and the MDEQ and Flint public officials would have taken timely action to address the concerns.

324.    As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this First Amended Complaint, Plaintiffs have suffered violations of their fundamental constitutional rights including, but not limited to:

a.    Serious and in some cases life threatening and irreversible bodily injury;

b.    Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

c.    Pain and suffering;

d.    Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

325.    The conduct of Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

**COUNT V-CAUSE OF ACTION**
**42 U.S.C. § 1985(3) INVIDIOUS RACIAL ANIMUS:**
**ALL PLAINTIFFS AGAINST SNYDER, DILLON, WRIGHT, WALLING, AMBROSE,**
**KURTZ & EARLEY**

326.    Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

327.    Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz and Earley, acting under color of law, and in their respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated Plaintiffs' rights under the Thirteenth Amendments to the United States Constitution.

328.    42 U.S.C § 1985 (3) secures the rights of the Plaintiffs to be free from conspiracies, founded on invidious racial animus, to violate the constitutional rights of Plaintiffs to equal protection and due process.

329.    The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

330.    Defendants' conduct deliberately exposed Plaintiffs to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

331.    In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational.)

332.    These Defendants knew that the water from the Flint River was grossly inferior to the water Flint and Genesee County citizens had been receiving from DWSD.

333.    These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP which required millions of dollars of upgrades.

334.    These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

335.    Recognizing these facts, Defendants' conspired to devise an Interim Plan that allowed the predominately white water users of Genesee County to receive the safe superior water from DWSD and the predominately black water users of Flint would have to accept during the interim period grossly inferior, previously rejected and potentially unsafe Flint River water.

336.    There was no rational economic or fiscal justification for treating the predominately white water users of those parts of Genesee County outside if Flint differently than the water users in the predominately African American community of Flint because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

337.   Given the unexplained difference in treatment between these two groups of similarly situated water users, considering the absence of any rational economic or fiscal justification and taking into account the racial makeup of the community that received the grossly inferior and dangerous water product, the deliberate decisions and actions of these conspiring Defendants in devising the Interim Plan can fairly be said to be the product of invidious racial animus in violation of the Thirteenth Amendment. The provision of unhealthy and dangerous food and water is a badge, vestige and symbol of slavery abolished and prohibited by the Thirteenth Amendment.

338.   If Plaintiffs' community had been predominately white, Plaintiffs would have been treated the same as their white neighbors in Genesee County, and they too would have received DWSD water as part of the Interim Plan.

339.   Because Plaintiffs were water users in a predominately African American community, their complaints were disrespected and dismissed as exaggerated, without merit or inconsequential. If Plaintiffs' community had been predominately white, citizen complaints would have been treated as valid and the MDEQ and Flint public officials would have taken timely action to address the concerns. This disrespect and dismissive response arose directly from the conspiracy between these Defendants founded on invidious racial animus.

340.   As a direct and proximate result of the conspiracy and the unconstitutional acts of Defendants as alleged in this First Amended Complaint, have suffered violations of their fundamental constitutional rights including, but not limited to:

a.     Serious and in some cases life threatening and irreversible bodily injury;

b.     Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

c.     Pain and suffering;

   d. Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

341. The conduct of Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

**COUNT VI-CAUSE OF ACTION**
**PROFESSIONAL NEGLIGENCE:**
**ALL PLAINTIFFS AGAINST LAN PC, LAN INC. & LAD**

342. Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

343. The LAN Defendants undertook, for consideration, to render services for the City of Flint, which they should have recognized as necessary for the protection of Plaintiffs and their property.

344. The LAN Defendants undertook to perform a duty owed to Plaintiffs by the City of Flint and/or the State of Michigan. Additionally, the LAN Defendants, in undertaking to perform services related to the Flint water supply and in making public statements about the safety of the Flint water supply, assumed a duty directly to the Plaintiffs.

345. Based on their undertaking, the LAN Defendants had a duty to Plaintiffs, as residents and property owners in the City of Flint, to exercise that degree of care consistent with the greater degree of knowledge and skill possessed by design professionals, as well as an ethical duty to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

346. The LAN Defendants also owed a duty to Plaintiffs to notify the proper authorities of unethical illegal practices of others whose actions or decisions posed threats to public health

and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

347.   The LAN Defendants' duties to Plaintiffs included, but were not limited to, a duty to properly administer the placing of the FWTP into operation using the Flint River as a primary source, a duty to do so in such a manner that would not endanger the health and property of Plaintiffs, a duty to take other actions consistent with the greater degree of knowledge and skill possessed by design professionals, and/or the duty to report to public authorities the dangers posed to public health and property that would result from the failure to install and/or provide proper anti-corrosive treatment when using the Flint River as a primary source of drinking water.

348.   Plaintiffs relied on the LAN Defendants to perform their duties.

349.   The LAN Defendants failed to exercise reasonable care in performing their duties, including in preparing for and executing the transition from treated DWSD water to untreated Flint River water, which was unsafe, toxic and unsuitable for human use.

350.   The LAN Defendants failed to undertake reasonable care and conduct as a professional engineering firm.

351.   The LAN Defendants failed to exercise reasonable care when they did not ensure that corrosion control measures were implemented in a water supply system containing lead pipes that was being transitioned onto a highly corrosive water source.

352.   The LAN Defendants failed to exercise reasonable care when they failed to conduct a root cause analysis which would have uncovered that the source of the TTHM was corrosive water coursing through the City's pipes, which also would cause the release of lead and *legionella*.

353.    The LAN Defendants failed to exercise reasonable care when they did not forcefully recommend the addition of phosphates to the water.

354.    The LAN Defendants failed to exercise reasonable care when they failed to recommend that the City use a coagulant other than ferric chloride.

355.    The LAN Defendants failed to exercise reasonable care for other reasons alleged throughout this complaint, including ignoring at least several red flags that should have alerted them to the relevant problems.

356.    Plaintiffs suffered harm resulting from the LAN Defendant's failures to exercise reasonable care.

357.    The LAN Defendants' failure to exercise reasonable care was direct and proximate cause of the Plaintiffs' injuries, which were entirely foreseeable.

358.    The LAN Defendants are liable to Plaintiffs for all harms resulting to them from the LAN Defendants' failures to exercise reasonable care.

359.    As a direct and proximate result of the LAN Defendants' actions and/or omissions, Plaintiffs have been lead poisoned and/or suffered from life threatening Legionnaires' disease, shigellosis, pneumonia, infections, dementia, and have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits and lost earning capacity.

360.    Further, as a direct and proximate cause of the LAN Defendants' acts and omissions, Plaintiffs' property has been damaged in the form of damaged pipes, service lines, and

appliances in their homes, a diminution of property values, and other property and monetary damages.

361.    The LAN Defendants' conduct and/or failure(s) to act constitutes gross negligence because they were so reckless that they demonstrated a substantial lack of concern for whether an injury or harm would result.

362.    The LAN Defendants' professional negligence was voluntary conduct that inspired humiliation, outrage, and indignity by the Plaintiffs.

363.    The LAN Defendants' conduct was malicious, willful and wantonly as to disregard the Plaintiffs' rights, for the following reasons:

364.    The LAN Defendants knew that Plaintiffs were relying upon them to provide Flint with safe water;

365.    The LAN Defendants knew that the failure to include corrosion control chemicals posed threats to public health and property that would result in injury and damages to Plaintiffs; and/or

366.    The LAN Defendants knew that the failure to notify and/or report to the proper authorities of unethical or illegal practices of others whose actions or decisions posed threats to public health and property that would result in injury and damages to Plaintiffs.

367.    As a result of the foregoing, Plaintiffs seek an award of exemplary damages from the LAN Defendants so as to deter such morally reprehensible conduct by the LAN Defendants and similarly situated corporations in the future.

## COUNT VII-CAUSE OF ACTION
## PROFESSIONAL NEGLIGENCE:
## ALL PLAINTIFFS AGAINST THE VEOLIA DEFENDANTS

368.    Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

369.     Plaintiffs bring this cause of action against the Veolia Defendants. The Veolia Defendants undertook, for consideration, to render services for the City of Flint, which they should have recognized as necessary for the protection of Plaintiffs.

370.     The Veolia Defendants undertook to perform a duty owed to Plaintiffs by the City of Flint and/or the State of Michigan. Additionally, the Veolia Defendants, in undertaking to perform services related to the Flint water supply and in making public statements about the safety of the Flint water supply, assumed a duty directly to the Plaintiffs.

371.     Based on their undertaking, the Veolia Defendants had a duty to Plaintiffs to exercise reasonable care.

372.     Plaintiffs relied on the Veolia Defendants to perform the duty to inspect the City's water supply to make sure that it was safe.

373.     The Veolia Defendants failed to undertake reasonable care and conduct as a professional engineering firm.

374.     The Veolia Defendants failed to exercise reasonable care in inspecting the city's water system and issuing its interim and final reports.

375.     The Veolia Defendants failed to exercise reasonable care when they declared that Flint's drinking water met federal and/or state and/or all applicable requirements.

376.     The Veolia Defendants failed to exercise reasonable care when they represented that Flint's drinking water was safe.

377.     The Veolia Defendants failed to exercise reasonable care when they discounted the possibility that problems unique to Flint's water supply were causing medical harm and property and monetary damage.

378.    The Veolia Defendants failed to exercise reasonable care when they failed to warn about the dangers of lead leaching into Flint's water system.

379.    The Veolia Defendants failed to exercise reasonable care when they did not forcefully recommend the immediate implementation of corrosion control for purposes of preventing lead contamination in Flint's water supply.

380.    The Veolia Defendants failed to exercise reasonable care when they failed to conduct a root cause analysis which would have uncovered that the source of the TTHM was corrosive water coursing through the City's pipes, which also would cause the release of lead and *legionella*.

381.    The Veolia Defendants failed to exercise reasonable care when they did not forcefully recommend the addition of phosphates to the water.

382.    The Veolia Defendants failed to exercise reasonable care when they failed to recommend that the City use a coagulant other than ferric chloride.

383.    The Veolia Defendants failed to exercise reasonable care through other conduct described in this complaint.

384.    Plaintiffs suffered harm resulting from the Veolia Defendants' failures to exercise reasonable care to protect its undertaking.

385.    The Veolia Defendants' failures to exercise reasonable care to protect their undertaking directly and proximately caused the Plaintiffs' injuries and were entirely foreseeable.

386.    The Veolia Defendants are liable to Plaintiffs for all harms resulting to them from their failures to exercise reasonable care.

387.    As a direct and proximate result of the Veolia Defendants' actions and/or omissions, Plaintiffs have been lead poisoned and/or suffered from life threatening Legionnaires'

disease, shigellosis, pneumonia, infections, dementia, and have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits and lost earning capacity.

388.    Further, as a direct and proximate cause of the Veolia Defendants' acts and omissions, Plaintiffs' property has been damaged in the form of damaged pipes, service lines, and appliances in their homes, a diminution in property values, and other property and monetary damages.

389.    The Veolia Defendants' conduct and/or failure(s) to act constitute gross negligence because it was so reckless that they demonstrated a substantial lack of concern for whether an injury or harm would result.

390.    The Veolia Defendants' professional negligence was voluntary conduct that inspired humiliation, outrage, and indignity by the Plaintiffs.

391.    The Veolia Defendants' conduct was malicious, willful and wantonly as to disregard the Plaintiffs' rights for the following reasons:

    a.    The Veolia Defendants knew or should have known that Plaintiffs were relying upon them to provide Flint with safe water;

    b.    The Veolia Defendants knew or should have known that the failure to include corrosion control chemicals posed threats to public health and property that would result in injury and damages to Plaintiffs; and/or

    c.    The Veolia Defendants knew or should have known that the failure to notify and/or report to the proper authorities of unethical or illegal practices of others whose actions or decisions posed threats to public health and property that would result in injury and damages to Plaintiffs.

392.     As a result of the foregoing, Plaintiffs seek an award of exemplary damages from the Veolia Defendants so as to deter such morally reprehensible conduct by them and similarly situated corporations in the future.

**COUNT VIII-CAUSE OF ACTION**
**FRAUD:**
**ALL PLAINTIFFS AGAINST THE VEOLIA DEFENDANTS**

393.     Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

394.     Plaintiffs bring this cause of action against the Veolia Defendants.

395.     Upon information and belief, the Veolia Defendants made false and material representations regarding the safety of Flint's water, the nature and cause of the water quality problems in Flint, and the risks to public health and property damage.

396.     Upon information and belief, the false and material representations include, but are not limited to, statements in the Veolia Defendants' 2015 Interim Report that:

     a.     Flint's water was "safe" and "in compliance with drinking water standards[.]"

     b.     The observed discoloration was merely aesthetic and not indicative of water quality or health problem, and

     c.     Medical problems are because "[s]ome people may be sensitive to any water."

397.     Upon information and belief, the material representations and other acts and omissions of the Veolia Defendants constitute fraud.

398.     Upon information and belief, the Veolia Defendants knew the representations were made recklessly without any knowledge about their veracity.

399.     Upon information and belief, the Veolia Defendants made the representations with the intention that Plaintiffs would act and rely on them, which they did.

400.    As a direct and proximate result, Plaintiffs suffered and continue to suffer injuries and damages.

## COUNT IX-CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS:
## ALL PLAINTIFFS AGAINST ENGINEERING DEFENDANTS

401.    Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

402.    The Engineering Defendants owed Plaintiffs a duty to exercise reasonable care.

403.    As alleged herein, the Engineering Defendants failed to exercise reasonable care, which had the direct and foreseeable result of causing Plaintiffs severe emotional distress.

## COUNT X-CAUSE OF ACTION
## NEGLIGENCE:
## ALL PLAINTIFFS AGAINST ENGINEERING DEFENDANTS

404.    Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

405.    The Engineering Defendants owed Plaintiffs a duty to exercise reasonable care.

406.    As alleged herein, the Engineering Defendants, individually and collectively, breached their duty of reasonable care by allowing contaminants to be released into the drinking water of the City of Flint, including but not limited to lead.

407.    Upon learning of the release of the contaminants, the Engineering Defendants owed Plaintiffs a duty to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiffs and their property and/or to act reasonably to minimize the damage to Plaintiffs and their property.

408.    The Engineering Defendants breached that duty by failing to act reasonably in providing Plaintiffs usable water. Furthermore, the Engineering Defendants failed to take

reasonable, adequate and sufficient steps or action to eliminate, correct, or remedy any contamination after it occurred.

409.     The Engineering Defendants further breached that duty by failing to timely notify the Plaintiffs of the contamination of Flint's drinking water, and, consequently, the presence of lead and other contaminants in the homes, businesses and rental properties of Plaintiffs.

410.     As a result of the Engineering Defendants' breaches of their duty to timely notify, Plaintiffs were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of the Engineering Defendants' negligence for many years into the future.

411.     The Engineering Defendants negligently breached their duties to the Plaintiffs ss to ensure that the Flint water supply was safe and sufficiently secure as to prevent the release of the contaminants into the water facilities and, consequently, the homes and rental properties of Plaintiffs.

412.     The Engineering Defendants wilfully and wantonly breached their legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety.

413.     As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered and continue to suffer personal and property damages.

## COUNT XI-CAUSE OF ACTION
## GROSS NEGLIGENCE:
## ALL PLAINTIFFS AGAINST THE ENGINEERING DEFENDANTS

414.     Plaintiffs incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

415. The Engineering Defendants owed Plaintiffs a duty to exercise reasonable care. Upon learning of the release of the contaminants, the Engineering Defendants owed Plaintiffs a duty to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiffs and their property.

416. As alleged herein, the Engineering Defendants, individually and collectively, caused drinking water with concentrations of lead exceeding applicable standards, and *legionella*, to be provided to Plaintiffs in contravention of federal environmental statutes and guidelines. As such, the Engineering Defendants gross negligently, recklessly, wilfully, wantonly, and/or intentionally contaminated drinking water in and around the real property of Plaintiffs.

417. The Engineering Defendants owed Plaintiffs a duty to act with reasonable care in undertaking their obligations. As professional engineers, the Engineering Defendants had a duty to act as an engineer of ordinary learning, judgment, or skill would. As more fully described herein, the Engineering Defendants breached their duties of care by (1) failing to conduct a root cause analysis which would have revealed that the pipes were corroding and causing lead and legionella to enter the residents' homes; (2) failing to recognize at least several red flags that should alert a prudent engineer to extensive corrosion problems and lead to implementation of effective protective measures; (3) failing to advise the City that they were out of compliance with the Safe Drinking Water Act's Lead and Copper Rule; (4) failing to advise the City that the addition of a corrosion inhibitor was necessary to prevent lead poisoning and Legionnaires' disease; and (5) advising the City to use or even increase the dosage of highly acidic ferric chloride, rather than advising that the pH of the water should be increased.

418. As a direct and proximate result of the Engineering Defendants' gross negligence, Plaintiffs have suffered and continue to suffer personal and property damages.

419.   Defendants' conduct was so reckless as to demonstrate a substantial lack of concern for whether injury would result to Plaintiffs.

**COUNT XII:**
**VIOLATION OF SAFE DRINKING WATER ACT'S NOTIFICATION**
**REQUIREMENTS, 40 C.F.R. § 141.85:**
**ALL PLAINTIFFS AGAINST CITY OF FLINT, STATE OF MICHIGAN AND**
**RICHARD D. SNYDER**

387.   Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

388.   The Safe Drinking Water Act ("SDWA") was passed by Congress in 1974, with subsequent amendments in 1986 and 1996, to ensure and protect the quality of Americans' drinking water. Under SDWA, the United States Environmental Protection Agency ("U.S. EPA") is given authority to set the standards for drinking water quality and oversee states, localities, and water suppliers who implement those standards.

389.   Through the SDWA, all public water systems in the United States need to follow the standards and regulations set by the EPA. U.S.EPA has set maximum contaminant levels and/or treatment technique requirements for over 90 different contaminants in public drinking water, including microorganisms, disinfectants, disinfections by-products, inorganic chemicals, organic chemicals, and radionuclides.

390.   Plaintiffs provided Defendants, the Administrator of the U.S. Environmental Protection Agency (EPA), and the Michigan Attorney General with at least sixty days' written notice of the violations of law alleged here in the form and manner required by the Safe Drinking Water Act. 42 U.S.C. §300j-8(b); 40 C.F.R. §§ 135.11-.13. Written notice was provided on February 27, 2017.

391.   The Government Defendants operate a "public water system" pursuant to the Safe Drinking Water Act. 42 U.S.C. § 300(f); 40 C.F.R. §141.2.

392.     Regulations established under the SDWA require that, ". . .all water systems must provide a consumer notice of lead tap water monitoring results to persons served at the sites (taps) that are tested. Any system exceeding the lead action level shall implement the public education requirements." 40 C.F.R, §141.80(g).

393.     Since April 24, 2015, Defendants have violated and continue to violate the Safe Drinking Water Act by failing to comply with the requirement that water systems notify customers of the individual results of tap water samples collected and tested for lead within thirty days after the water system receives the results. 40 C.F.R. §§ 141.85(d)(1),(d)(2).

394.     For all monitoring conducted since the switch to the Flint River was made on April 24, 2015, Defendants have failed to notify Plaintiffs and those residing at each sampling site of the presence of elevated lead levels in the public water supply.

**COUNT XIII:**
**VIOLATION OF SAFE DRINKING WATER ACT'S REQUIREMENT TO OPERATE**
**OPTIMAL CORROSION, 40 C.F.R. § 141.81-.82:**
**ALL PLAINTIFFS AGAINST DEFENDANTS CITY OF FLINT, STATE OF MICHIGAN**
**AND RICHARD D. SNYDER**

395.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

396.     Plaintiffs provided Defendants, the Administrator of the U.S. Environmental Protection Agency (EPA), and the Michigan Attorney General with at least sixty days' written notice of the violations of law alleged here in the form and manner required by the Safe Drinking Water Act. 42 U.S.C. §300j-8(b); 40 C.F.R. §§ 135.11-.13. Written notice was provided on February 27, 2017.

397.     The Government Defendants operate a "public water system" pursuant to the Safe Drinking Water Act. 42 U.S.C. § 300(f); 40 C.F.R. § 141.2.

398.     To address corrosion of lead and copper into drinking water, U.S. EPA issued the Lead and Copper Rule (LCR) under the authority of the SDWA. 42 U.S.C §§ 300(f) to 300j-26; 40 C.F.R. § 141.80-141.91. One requirement of the LCR is corrosion control treatment to prevent lead and copper from contaminating drinking water. Corrosion control treatment means utilities must make drinking water less corrosive to the materials it comes into contact with on its way to consumers' taps. The regulations implementing the LCR, 40 C.F.R. § 141.80-141.91, "constitute the national primary drinking water regulations for lead and copper. Unless otherwise indicated, each of the provisions of this subpart applies to community water systems and non-transient, non-community water systems (hereinafter referred to as "water systems" or "systems")." 40 C.F.R. § 141.80(a).

399.     The LCR establishes a treatment technique that includes requirements for corrosion control treatment, source water treatment, lead service line replacement, and public education. "These requirements are triggered, in some cases, by lead and copper action levels measured in samples collected at consumers' taps." 40 C.F.R. § 141.80(b).

400.     The LCR requires systems to monitor drinking water at customer taps. If lead concentrations exceed an action level of 15 ppb in more than 10% of customer taps sampled, the system must undertake a number of additional actions to control corrosion.

401.     As described more fully herein, the lead levels in Flint's water exceeded the thresholds established under the LCR.

402.     Since the switch to the Flint River was made on April 24, 2015, Defendants have violated and continue to violate the Safe Drinking Water Act by failing to operate and maintain optimal corrosion control treatment.  40 C.F.R. § 141.82(g).

403. Defendants have failed to maintain optimal corrosion control treatment because it did not treat the water being sold to Flint residents with corrosion-inhibiting chemicals to minimize the amount of lead leaching into the public water supply.

404. The absence of optimal corrosion control treatment caused and continues to cause dangerous amounts of lead to enter the public water supply relied upon by Plaintiffs.

405. Additionally, the LCR provides that "[a]ny system exceeding the lead action level after implementation of applicable corrosion control and source water treatment requirements shall complete the lead service line replacement requirements contained in § 141.84." 40 C.F.R. § 141.80(f). A water system must replace annually, at least 7 percent of the initial number of lead service lines in its distribution system. The initial number of lead service lines is the number of lead lines in place at the time the replacement program begins. The system must identify the initial number of lead service lines in its distribution system, including an identification of the portion(s) owned by the system, based on a materials evaluation, including the evaluation required under § 141.86(a) and relevant legal authorities (*e.g.*, contracts, local ordinances) regarding the portion owned by the system. The Government Defendants have yet to comply with these requirements.

## PRAYER FOR RELIEF

Plaintiffs request the following relief from the court:

  a. An order declaring the conduct of the Government Defendants unconstitutional;

  b. An injunctive order to remediate the harm caused by the Government Defendants' unconstitutional conduct including, but not limited to: repairs of private property and establishment of medical monitoring to provide health care and other appropriate services to Plaintiffs for a period of time deemed appropriate by the Court;

c.   Appointment of a monitor who will assist in the development of remedial plans including, but not limited to: early education, education intervention programs, criminal and juvenile justice evaluations;

d.   An order for an award of compensatory damages;

e.   An order for an award of punitive damages;

f.   An order for equitable relief;

g.   An order for pre-judgment and post-judgment interest;

h.   An order for an award of reasonable attorney's fees and litigation expenses; and

i.   An order for all such other relief the court deems equitable.


## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury as to all those issues triable as of right.


Dated June 28, 2017                              Respectfully submitted,

                                                 Hunter Shkolnik
                                                 Paul J. Napoli
                                                 NAPOLI SHKOLNIK PLLC
                                                 360 Lexington Avenue, 11th Floor
                                                 New York, NY, 10017
                                                 Tel: (212) 397-1000
                                                 hunter@napolilaw.com
                                                 pnapoli@napolilaw.com